**BOWMAR INSTRUMENT CORPORATION, Plaintiff,**

v.

**CONTINENTAL MICROSYSTEMS, INC., CMI Products, Inc., Global Marketing Co. and International Fastener Research Corporation, Defendants.**

**No. 77 Civ. 6059 (CHT).**

United States District Court, S. D. New York.

Aug. 21, 1980.

**950**

Marshall, Bratter, Greene, Allison & Tucker, New York City, for plaintiff; Charles H. Miller, Paul A. Feigenbaum, New York City, Maura Wogan, of counsel.

Marshall G. Kaplan, Brooklyn, N. Y., for defendant Global Marketing Co.; Lowell M. Rubin, Brooklyn, N. Y., of counsel.

## OPINION

TENNEY, District Judge.

The plaintiff in this trademark infringement suit, Bowmar Instrument Corp. ("Bowmar") has moved for summary judgment against defendants Global Marketing Co. ("Global"), Continental Microsystems, Inc. ("Continental"), and CMI Products, Inc. ("CMI") and for a default judgment against Continental and CMI. Bowmar claims that the defendants: (1) infringed its trademark rights in violation of section 32 of the Lanham Act, 15 U.S.C. § 1114; (2) committed false designation of origin in violation of section 43(a) of the Lanham Act, *id.* § 1125(a); (3) violated New York's "anti-dilution" law, N.Y. General Business Law § 368–d (McKinney 1968); (4) committed acts of unfair competition; and (5) breached a License Agreement between the parties. Bowmar seeks a default judgment against Continental and CMI on the grounds that (1) both defendants failed to meet their discovery obligations and do not intend to respond; and (2) CMI did not comply with this Court's January 18, 1979 Order to retain new counsel. Bowmar has also moved to dismiss the defendants' counterclaims. The plaintiff seeks injunctive relief, actual damages, treble damages, and attorneys' fees.

Summary judgment is granted against Global and CMI on the first four claims and against Continental on all five. A default judgment is also granted against Continental and CMI. The defendants' counterclaims are dismissed. Bowmar is entitled to injunctive relief, damages, which are to be determined in an accounting of defendants' profits as described herein, costs of this litigation, and the attorneys' fees incurred since the time this action was restored to the active calendar.

*Background*

Bowmar is an Indiana corporation engaged in the business of manufacturing and

selling electronic and electromechanical components, including consumer electronic products. Affidavit of William M. Crilly, President and Chief Executive of Bowmar, sworn to February 4, 1980 ("Crilly Aff."), ¶ 2. Bowmar owns a group of trademarks, including "Bowmar" and "Bowmar Brain," that have been promoted through advertising. *Id.* In June 1975, Bowmar entered into an Agreement with International Fastener Research Corporation ("IFR"), a New York corporation, under which Bowmar sold its calculator and watch operations to IFR and granted that company an exclusive license and right to use the Bowmar Trademarks on a limited group of products. Pursuant to the Agreement, Bowmar granted to IFR,

> subject to the license agreement in the form of Schedule 6 hereto, an exclusive license and right, in connection with the manufacture and sale of calculators and watches, but not otherwise, to use the trademark "Bowmar" and all other trademarks and copyrights, registered and unregistered, domestic and foreign, owned by the Sellers and used in connection with the manufacture and sale of calculators and watches ("Trademark Licenses"), it being understood that (A) the Buyers shall not use the name "Bowmar" or any name similar thereto in or as part of any company name, nor as the trade name or style of any business, and (B) the Buyers and their successors and assigns shall have no right to transfer the rights under the Trademark Licenses granted hereunder except in connection with a transfer of the entire business of manufacture and sale of calculators and watches, either transferred as one or separate businesses.

Exh. A. to Crilly Aff. ¶ 1(a)(iii).

Under the License Agreement, Bowmar retained the right to sell any merchandise not purchased by IFR. *Id.*, Schedule 6, ¶ 1. Paragraph Two provided that the "Licensee agrees that it will not use the License Trademarks or any other trademark likely to be confused therewith on any product other than calculators and watches." *Id.* ¶ 2. The merchandise manufactured and sold pursuant to the Agreement was to "be of the same nature and of at least the same quality as those products" previously manufactured by Bowmar. *Id.* ¶ 3. To insure that this standard of quality was met, Bowmar would receive samples of the merchandise sold and could preclude the sale of any item to which it objected. *Id.* ¶ 4. Paragraph Eight stated that the "Licensee agrees that it will not use the name 'Bowmar' as or in connection with its trade name or any part thereof." *Id.* ¶ 8. All the provisions of the License Agreement were deemed to be binding on the parties' assigns and successors. *Id.* ¶ 10.

In the fall of 1975, Continental purchased from IFR the watch and calculator operation, including the title and interest to the License Agreement. Prior to receiving official notice of this transaction, Bowmar had complained to IFR about the manner in which that company had been using the "Bowmar" trademark in its advertising. Exhs. C and D to Crilly Aff. Bowmar first found out about Continental from a letter written by that company's president to a Bowmar officer on stationery that appeared to violate the License Agreement in that it made the Bowmar name and trademark part of Continental's letterhead. After several complaints and discussions, Continental revised its letterhead. Counsel for Continental wrote Bowmar that the new stationery "clearly indicates that [Continental] is the manufacturer of Bowmar calculators, digital time pieces and does not give the impression that Bowmar Instrument Corporation is the source of such products." Exh. G to Crilly Aff., Letter to Jerome Coben, counsel to Bowmar, from Jay Howard Grodin, dated December 1, 1975.

Unfortunately, the matter did not end there. After seeing some magazine articles suggesting that Continental had the right to manufacture and sell other Bowmar–labelled products, Bowmar again registered its complaints. Continental's counsel responded that the references resulted from an inadvertent error and that Continental "will not introduce, manufacture, distribute or sell home video games or any other product (other than electronic calculators and

watches) under [the Bowmar] trademark." Exh. K to Crilly Aff., Letter to Stanley Moss, counsel to Bowmar, from Jay Howard Grodin, dated June 10, 1976. These assurances, however, soon became suspect when a series of articles and advertisements appeared that referred to Continental's production and sale of a complete line of Bowmar video home games. *See* Exhs. L through P to Crilly Aff. After yet another complaint, Bowmar was advised that these representations resulted from the same inadvertent error that had given rise to the earlier complaints and that the original assurances were still firm. Bowmar was also informed that Continental intended to run advertisements for a variety of products that it sold but that the name "Bowmar" would appear only with respect to watches and calculators. Exh. R. to Crilly Aff., Letter to Jerome Coben from Jay Howard Grodin, dated August 11, 1976.

Soon after, just the opposite occurred. In the Summer 1977 issue of Consumer Electronic Product News an advertisement offering watches, television games, and smoke detectors was published under the name CMI Products: Bowmar and a New York address was given. Exh. S to Crilly Aff. Telephone calls to that office were answered "Bowmar."

Bowmar decided to terminate the License Agreement. A letter from Bowmar's counsel to Continental informed that company that "[b]y reason of your continuing flagrant violations of the Agreement, which have occurred notwithstanding repeated assurances to the contrary, our client has instructed us to advise you that it is hereby terminating the Agreement and the license granted thereunder as and for your repeated breaches thereof." Exh. T to Crilly Aff., Letter to Continental from Stanley Moss, dated September 28, 1977. Bowmar demanded that Continental stop manufacturing and selling *any* product under the Bowmar name and trademark and that it account for any sales made in violation of the Agreement.

Several weeks later, a meeting was held between Bowmar, Continental, and IFR officers. After that meeting, Continental's counsel wrote to counsel for Bowmar explaining that the unauthorized advertisements had resulted from the use of a new advertising agency that was not familiar with the limitations of the Agreement and the inexperience of the new staff in Continental's New York office. Exh. U to Crilly Aff., Letter to Stanley Moss from Jay Howard Grodin, dated November 4, 1977. The letter repeated the standard assurances that the Agreement's restrictions would not be violated in the future. Bowmar soon concluded that these assurances were groundless. Several days after receiving this letter, two employees of Bowmar's counsel sought to purchase a "Bowmar Fire Warden Smoke Detector" that had been advertised by the defendants. One individual was referred to Global after calling the New York office listed in the CMI: Bowmar advertisement. Global had an office right next door in the same building. Both individuals asked specifically for Bowmar merchandise and purchased what were allegedly Bowmar products. Exhs. V and W to Crilly Aff., Affidavit of Patricia Consolazio, sworn to December 13, 1977; Affidavit of Joseph J. Ceccarelli, sworn to December 1, 1977. Counsel for Bowmar also visited this building and photographed the "CMI–Bowmar" sign on the wall and the Bowmar trademark on the door of the "CMI–Bowmar" office. The door of the Global office had a sign reading "Global Marketing Co." without the Bowmar name or trademark. Exh. X to Crilly Aff., Affidavit of Jerome Coben, sworn to December 13, 1977.

Further discussions ensued between Bowmar and the defendants in a mutual effort to avoid litigation. The proverbial last straw appears to have been a December 12, 1977 advertisement in the New York Daily News announcing that the Bowmar Fire Warden Smoke Detector "with a brain" was available at Macy's. Upon concluding that the "defendants' only desire was to capitalize on the Christmas buying season by further infringing on Bowmar's rights," the plaintiff instituted this action. Crilly Aff. ¶ 25.

Bowmar sued four defendants in this suit: IFR, Continental, CMI and Global. Bowmar and IFR are currently in the process of settling their differences and that defendant is not a party to this motion. The relationship between Continental and CMI, two California corporations, is not entirely clear. The defendants claim that CMI acquired the rights under the License Agreement from Continental after the assignment made by IFR. No document of transfer has been submitted to the Court and Bowmar was never informed of this alleged assignment by Continental. Nevertheless, it appears that these two closely connected corporations acted in concert. While the name CMI/Bowmar or CMI Products: Bowmar was generally used, Bowmar continued to present its complaints to Continental and that company always responded through its attorney who frequently referred to his client as CMI. Continental was controlled by Ronald Semler who owned 50% of the stock in CMI. Affidavit of Irwin Iroff, vice president of Global, sworn to March 14, 1980 ("Iroff Aff.") ¶¶ 2, 3. The remaining 50% of CMI stock was held by Stanley Blaustein and Irwin Iroff. *Id.* ¶ 3. Both of these corporations are now defunct and insolvent. *Id.* ¶ 2. Global, a wholesaler of electronic products, is essentially a two–man business consisting of Blaustein and Iroff. *Id.* ¶ 4. All three corporate defendants were initially represented by the same law firm. One answer to Bowmar's complaint was filed on behalf of "CMI Products, Inc. and Webster Merchandising Inc., doing business as Global Marketing Co." Global is allegedly the trade name of Webster Merchandising Ltd. *Id.* at 1. A separate answer was filed on behalf of Continental Microsystems Inc., also referred to as CMI. Iroff contends that there was "no interrelationship" between CMI and Global; "Semler controlled CMI and [Iroff and Blaustein] went into business with him as minority stockholders in CMI only." *Id.* at 6. Notwithstanding this characterization, Iroff has admitted that Global rented space to CMI, advanced customs duties for goods imported through New York, paid some CMI telephone bills and employees' salaries, and placed the Bowmar name on Global's office door for a period of time. *Id.* at 5; Deposition of Irwin Iroff, taken May 18, 1978 ("Irwin Dep."), at 74, 79, 112, 114–16.

Bowmar's lawsuit proceeded in fits and starts. After commencing the action in December 1977, the plaintiff moved for preliminary injunctive relief. Following oral argument, the parties signed a Stipulation and Order in which defendants "CMI Products and Global" [1] represented, in part, that they: (1) had been manufacturing and marketing a smoke detector under the Bowmar name and trademark; (2) possessed a certain number of smoke detectors and boxes at the Global office; (3) used the Bowmar name in connection with the manufacture and sale of video games; (4) had shipped about 500 smoke detectors to Macy's and approximately 3,000 were sold and distributed to 200 different stores throughout the United States; (5) had stopped shipping out smoke detectors by November 1977; (6) were not currently manufacturing any video game units; and (7) had removed the Bowmar name from their building directory and office door prior to the commencement of this action and had instructed employees not to answer the telephone "Bowmar." The defendants also agreed to take certain actions to effectuate the Order. All smoke detector boxes, warranties, manuals, and promotional materials with the Bowmar name on it were to be destroyed or altered. All smoke detectors still in Macy's possession would be reacquired by the defendants. The defendants promised not to use the Bowmar name or trademark in any unauthorized fashion at the upcoming Consumer Electronic Show in Las Vegas. Finally, the Order stated that:

Defendants shall not manufacture or sell any products using the Bowmar name or trademark in connection therewith in any fashion, with the exception of calculators and watches, as to which Defendants

---

1. A separate Stipulation and Order was signed by Bowmar and IFR. Exh. 6 to Affidavit of

Paul A. Feigenbaum, sworn to February 8, 1980.

claim they are entitled to use the Bowmar name and trademarks and Plaintiff claims they are not so entitled.

The Order, which was to be in effect pending further judicial hearings and orders, was signed without prejudice to or waiver of the parties' rights and remedies and the defendants expressly stated that they admitted no wrongdoings. Exh. 7 to Affidavit of Paul A. Feigenbaum, sworn to February 8, 1980 ("Feigenbaum Aff."), Stipulation and Order signed by the Honorable Robert L. Carter, dated December 21, 1977.

By order dated January 18, 1978, former counsel for Global, Continental, and CMI was permitted to withdraw from the case. Global had retained new counsel and Continental and CMI were directed to file a notice of appearance within thirty days, "failing which the Court [would] entertain a motion for a default order." CMI never complied with that Order. Discovery commenced in May and Bowmar deposed Irwin Iroff, Global's vice president and a CMI shareholder. Soon after, an agreement in principle on a settlement was reached by the parties. While settlement papers were being prepared, an Order of Discontinuance was entered. This Order, however, proved to be premature. More than one month later, Bowmar was still waiting for the defendants to execute the settlement documents forwarded to them. Bowmar's counsel then wrote to the defendants' former counsel and stated that the litigation would have to be pursued if the settlement was not finalized. No response was forthcoming. Feigenbaum Aff. ¶¶ 5–8. To the plaintiff, "[i]t became apparent that the defendants had reneged on settlement, after protracting the settlement negotiation process for a number of months." Id. ¶ 9. Accordingly, in November 1978 Bowmar moved to restore the case to the active calendar. Bowmar then sought further discovery from CMI and Continental. These requests were ignored. Id. ¶ 15. Continental's new counsel has informed Magistrate Nina Gershon and plaintiff's counsel that Continental intends to default with respect to the deposition notices and document requests. Exh. 20 to Feigenbaum Aff., Letter to Ira Sloane from Paul A. Feigenbaum, dated July 27, 1979 and confirmed by Ira Sloane.

■ Bowmar moved for summary judgment in February 1980. Global is the only defendant that responded to this motion. According to Iroff, Continental and CMI are "insolvent, incapable of responding in damages and their principal, Semler, has no interest in this litigation or in the Bowmar trademark." Iroff Aff. at 4. Iroff also contends "the overwhelming bulk" of the "more than five pounds of paper" amassed by the plaintiff on behalf of this motion "has nothing to do with Global and . . . antedates any connection by Global in this matter." It is true that much of the documentary and factual evidence marshalled by the plaintiff concerns events that preceded Global's actual involvement in this case. Global, however, is liable for the acts it committed in violation of Bowmar's rights even if its cohorts no longer have anything to defend.

### Summary Judgment

■ In resolving a motion for summary judgment, a district court "cannot try issues of fact; it can only determine whether there are issues to be tried." *American Mfrs. Mut. Ins. Co. v. American Broadcasting–Paramount Theatres, Inc.*, 388 F.2d 272, 279 (2d Cir. 1967). The party making the motion has the burden of proving that "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c); *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978). When a motion for summary judgment is supported by the necessary documentation, the opposing party must set forth "concrete particulars" and cannot rest upon "conclusory allegations or denials." *Id.* at 33. Of course, when conflicting inferences can be drawn from the facts, judgment should not be granted. *Robertson v. Seidman & Seidman*, 609 F.2d 583, 591 (2d Cir. 1979). When no genuine issue of fact appears, summary judgment may be appropriate in a trademark infringement suit, see, e. g., *Venetianaire Corp. v. A & P*

*Import Co.,* 429 F.2d 1079, 1080 (2d Cir. 1970), or an action seeking injunctive relief, *see, e. g., SEC v. Research Automation Corp., supra,* 585 F.2d at 34.

*Trademark Infringement*

▪ A cause of action for trademark infringement arises when a trademark is used (1) without consent, (2) in connection with the sale of goods, (3) in a manner that is likely to cause confusion or to deceive purchasers as to the source or origin of the goods. *Franchised Stores of New York, Inc. v. Winter,* 394 F.2d 664, 668 (2d Cir. 1968). The undisputed facts in this case establish that all the defendants used Bowmar's trademark without consent in connection with the sale of goods. The License Agreement limited the use of the trademark to watches and calculators. As succinctly stated by Global, "[t]here is no question that the name Bowmar appeared on products other than digital watches and calculators." Defendant's Memorandum at 6. Furthermore, the defendants continued to use the Bowmar name in connection with watches and calculators after the plaintiff had rightfully terminated the License Agreement. See *infra.* Finally, Global may be held equally liable as the other defendants even though it claims that it "never manufactured anything" but only served as a distributor or wholesaler. *See Goodyear Tire & Rubber Co. v. H. Rosenthal Co.,* 246 F.Supp. 724, 729 (D.Minn. 1967); *Saratoga Vichy Spring Co. v. Saratoga Carlsbad Corp.,* 45 F.Supp. 260, 261 (S.D. N.Y.1942). Furthermore, such a claim is rather dubious in this case because Global was closely connected to Continental and CMI and must have been aware of Bowmar's prior complaints. *See Corning Glass Works v. Jeannette Glass Co.,* 308 F.Supp. 1321 (S.D.N.Y.1970); *Stix Products, Inc. v. United Merchants & Mfrs., Inc.,* 295 F.Supp. 479 (S.D.N.Y.1968).

Global contends that no confusion could have resulted in this case because "plaintiff's mark appeared in the public marketplace from only one source." Defendant's Memorandum at 6. According to Global,

the only Bowmar–labelled products available to the consumer were manufactured by CMI. *Id.* Therefore, "[a]ssuming *arguendo* that a consumer would completely ignore the trade style and see only the Bowmar name and assume the source to be the same as that for Bowmar calculators and watches, there would be no deception–he would be correct. The product he received would be from the same source and of the same quality." *Id.* at 7.

▪ The Court rejects Global's argument. Carried to its logical conclusion, this line of reasoning severely undermines the value of trademark protection and limited licensing agreements.

The trademark laws protect three interests which are present here: first, the senior user's interest in being able to enter a related field at some future time; second, his interest in protecting the good reputation associated with his mark from the possibility of being tarnished by inferior merchandise of the junior user; and third, the public's interest in not being misled by confusingly similar marks–a factor which may weigh in the senior user's favor where the defendant has not developed the mark himself.

*Scarves by Vera, Inc. v. Todo Imports Ltd.,* 544 F.2d 1167, 1172 (2d Cir. 1976). Each of these interests is at stake in the case at bar. Bowmar has marketed consumer products in the past and has expressly retained the right to use, or assign, its trademark in the future. It has promoted its name widely through national advertising and has an interest in maintaining its reputation by having some knowledge of or control over the products sold under the Bowmar trademark. In fact, the License Agreement specifically preserves Bowmar's right to object to products that it deems sub–standard. See *supra.* The consumer, confronted with a complete line of Bowmar products ranging from video games to smoke detectors, can only conclude that Bowmar has either manufactured these goods or authorized the use of its name in connection with their sale. Neither conclusion would be accurate in this case and the public would be misled.

This deception is not cured by Global's theory that the buyer could rightfully assume that the unauthorized "Bowmar" smoke detectors and games were produced by the same company that was authorized to make Bowmar watches and calculators. Contrary to Global's argument, the deceit lies in the obvious impression of authorized use that connotes a degree of knowledge or supervision by the named company. Whether the trademark owner actually exercises any control is between that company and the consumer and is irrelevant for trademark infringement purposes. If the product is deficient, the purchaser blames the company whose name is stamped on the item. If the product is good, that company gets the credit. The consumer, whose buying habits are determined by his previous experiences with a company's product, has a right to assume that the company's name that appears on the label has authorized its use.

■ It is well established that a trademark owner is protected against another's use of the trademark on a related, non–competing product. *See Scarves by Vera, Inc. v. Todo Imports Ltd., supra,* 544 F.2d at 1172. The complete absence of competition between the parties does not preclude relief in a trademark infringement action. *AMP Inc. v. Foy,* 540 F.2d 1181, 1183 (2d Cir. 1976). When the allegedly infringing products are non–competitive, the trademark owner's right to relief depends upon a number of factors: "the strength of his mark; the degree of similarity between the two marks; the proximity of the products; the likelihood that the prior owner will bridge the gap; actual confusion; the defendant's good faith in adopting his mark; the quality of defendant's products and the sophistication of the buyers." *Scarves by Vera, Inc. v. Todo Imports Ltd., supra,* 544 F.2d at 1173. Here, the mark used was identical to that owned by the plaintiff. The defendants have not challenged the strength or distinctiveness of Bowmar's trademark; in fact, it is conceded that the Bowmar name had good market value and that "Bowmar trademarks have become distinctive of Bowmar's goods." Iroff Dep. at 37, 138. Nor do defendants refute Bowmar's asser-

tion that its name is associated with the field of electronic consumer products beyond watches and calculators. That is precisely why they chose to exploit Bowmar's name in selling such items as smoke detectors and video games. The "proximity of the products" is thus not in dispute. Global does contend that Bowmar no longer markets consumer goods and has abandoned the electronic business. Iroff Aff. ¶ 1 and at 7. This bald assertion is unsupported by any evidence and is contradicted by the testimony of Bowmar's President. Crilly Aff. ¶ 2. Regardless of Bowmar's current activities, however, its name continues to be a marketable commodity and it has the right to use it on other goods or to grant such a license to other companies. Bowmar's reputation also underlies the confusion that is likely to result among consumers presented with a variety of Bowmar–labelled electronic goods. Concrete evidence of actual confusion need not be demonstrated in a case involving identical marks and similar products. *AMP Inc. v. Foy, supra,* 540 F.2d at 1185–87; *Kiki Undies Corp. v. Promenade Hosiery Mills, Inc.,* 411 F.2d 1097, 1100–01 (2d Cir. 1969), *cert. dismissed,* 396 U.S. 1054, 90 S.Ct. 707, 24 L.Ed.2d 698 (1970). The defendants' lack of "good faith" in their unauthorized use of the Bowmar trademark is amply demonstrated by the recitation of facts above and does not require further comment. Finally, while no evidence has been presented on the final two factors mentioned by the *Vera* court, neither the quality of the defendants' product nor the consumers' sophistication is an important or disputed issue in this case. On the basis of the considerations addressed here, the Court concludes that Bowmar has established a prima facie claim of trademark infringement against all three defendants.

*False Designation of Origin*

■ Section 43(a) of the Lanham Act prohibits the use, in connection with any goods or services, of "a false designation of origin, or any false description or representation." 15 U.S.C. § 1125(a). This remedial

provision should be broadly construed, *CBS Inc. v. Springboard Int'l Records*, 429 F.Supp. 563, 566 (S.D.N.Y.1976), and its restrictions extend to false advertising. *Alfred Dunhill Ltd. v. Interstate Cigar Co.*, 499 F.2d 232, 237 (2d Cir. 1974). No intent to deceive need be established, *Ringling Bros.–Barnum & Bailey Combined Shows, Inc. v. Chandris America Lines, Inc.*, 321 F.Supp. 707, 712 (S.D.N.Y.1971), and "[i]nnuendoes, indirect intimations, ambiguous suggestions are all covered by the statute." *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 467 F.Supp. 366, 374 (S.D.N.Y.), *aff'd*, 604 F.2d 200 (2d Cir. 1979). It is not necessary for the plaintiff to demonstrate actual confusion and the defendants' product need not be in direct competition with the products rightfully sold under the plaintiff's mark. *Id.* As recently stated by the Second Circuit:

> In order to be confused, a consumer need not believe that the owner of the mark actually produced the item and placed it on the market. . . . The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement.

*Id.*, 604 F.2d at 204–05 (citations omitted). It has thus been held that this provision "reaches a seller who exaggerates the scope of his patents, thereby creating a false impression that it is the exclusive source of a product, even though there is no misbranding or mislabelling of the article and no misrepresentation of its inherent attributes." *In re Uranium Antitrust Litigation*, 473 F.Supp. 393, 408 (N.D.Ill.1979).

 The undisputed facts described above clearly establish that all three defendants violated section 43(a) of the Lanham Act. The Bowmar name and trademark were placed on goods not covered by the License Agreement in an obvious attempt to enhance their marketability. The consumer would be misled into believing that Bowmar either manufactured the product or authorized the use of its mark. "Consumer confusion" would inevitably result and Bowmar would lose "the synonymous right of a trademark owner to control [its] product's reputation." *Dallas Cowboys*

*Cheerleaders, Inc. v. Pussycat Cinema, Ltd., supra*, 604 F.2d at 205, *quoting James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 274 (7th Cir. 1976).

 Global claims that it cannot be liable to Bowmar under this provision because it "did not manufacture or assemble and therefore did not apply, affix or annex any false designation." Defendant's Memorandum at 9. Global also contends it "has clearly shown that it believed the use of this trade style to be lawful and authorized." Neither of these assertions constitutes a valid defense. First, the provision states that liability may be imposed on any person "who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation." 15 U.S.C. § 1125(a). Global used the Bowmar name in connection with the goods it sold and had Bowmar–labelled boxes and pamphlets at its office. Furthermore, even a mere retailer is not immune from liability under the Lanham Act, *Goodyear Tire & Rubber Co. v. H. Rosenthal Co., supra; Saratoga Vichy Spring Co. v. Saratoga Carlsbad Corp., supra*, and Global played a much larger role in the sale of Bowmar–labelled goods. Second, Global's alleged belief that its conduct was lawful–which is not supported by the facts in this case–does not preclude liability. Intent is not a requisite element of a cause of action under section 43(a). The second part of the provision refers to a person who "with knowledge of the falsity" causes goods to be transported in commerce. This "knowledge" requirement is absent from the first part of the section quoted above.

In short, all three defendants violated section 43(a) of the Lanham Act by applying and using a false designation of origin and description in selling unauthorized "Bowmar" products.

### New York's "Anti–Dilution" Law

Section 368–d of New York's General Business Law provides:

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

Construing this statute in *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 544, 399 N.Y.S.2d 628, 632, 369 N.E.2d 1162 (1977) (citation omitted), the New York Court of Appeals stated:

[S]ection 368–d does extend the protection afforded trade–marks and trade names beyond that provided by actions for infringement and unfair competition. The evil which the Legislature sought to remedy was not public confusion caused by similar products or services sold by competitors, but a cancer–like growth of dissimilar products or services which feeds upon the business reputation of an established distinctive trade–mark or name. Thus, it would be of no significance under our statute that [defendant's product is not in competition with], nor likely to be confused with [the product sold by the plaintiff]. The harm that section 368–d is designed to prevent is the gradual whittling away of a firm's distinctive trade–mark or name.

▮ The uncontroverted allegations made by the plaintiff in this case clearly establish a prima facie violation of section 368–d. Therefore, as the Second Circuit stated in *Dallas Cowboys Cheerleaders*, "[e]ven if plaintiff had not established a likelihood of confusion, it would be entitled to relief under [this provision] which permits the enjoining of trademark copying despite the absence of confusion as to source of sponsorship." 604 F.2d at 205 n. 8.

▮ The *Allied Maintenance* decision asserted that the statute protects "only those trade names which are truly of *distinctive* quality or which have acquired a secondary meaning in the mind of the public." 42 N.Y.2d at 546, 399 N.Y.S.2d at 633, 369 N.E.2d at 633 (emphasis in original). Citing this statement, Global contends that Bowmar has presented "no independent evidence as to secondary meaning or distinctiveness." Defendant's Memorandum at 9. The Court disagrees. In *Allied Maintenance*, the Court of Appeals stated that secondary meaning can be established by showing that a name or mark "has become so associated in the mind of the public with that entity or its product that it identifies the goods sold by that entity and distinguishes them from goods sold by others." *Id.* At his deposition, Global's vice president agreed that Bowmar was a "marketable" name and stated that "[p]eople have ordered Bowmar product by name." Iroff Dep. at 37, 138. Iroff also affirmed that people associate the Bowmar name with watches and calculators. *Id.* at 138. These statements support the assertion of Bowmar's President that the company has promoted its trademarks through "many years of quality manufacturing efforts and substantial advertising." Crilly Aff. ¶ 2. More importantly, Iroff's statements satisfy the "mind of the public" standard posited by the New York Court of Appeals. Finally, actual proof of secondary meaning may not even be necessary where a defendant knows that the trademark owner objects to the use of its name and does not act fairly under the circumstances. *See Ferrara v. Scharf*, 466 F.Supp. 125, 134 (S.D.N.Y.1979); *National Lampoon, Inc. v. American Broadcasting Cos.*, 376 F.Supp. 733, 747 (S.D.N.Y. 1974). All three defendants are therefore liable under section 368–d for the dilution of Bowmar's trademark.

### Breach of License Agreement

▮ Plaintiff seeks summary judgment against Continental on the ground that Continental breached the License Agreement that was assigned to it by IFR. The undisputed facts of this case amply support this claim. Under New York law, which governed the Agreement, *see* Exh. A to Crilly Aff. (Agreement) ¶ 12(a), a trade-

mark licensor is entitled to terminate a license agreement if the licensee breaches the agreement. *New York Trust Co. v. Believe It or Not, Inc.*, 12 Misc.2d 736, 178 N.Y.S.2d 12 (Sup.Ct.1958). After numerous unauthorized uses of the Bowmar name, plaintiff terminated the License Agreement by letter dated September 28, 1977. This written termination notice was well–founded; Bowmar had more than sufficient evidence to support its claim that Continental had repeatedly violated the restrictive provisions of the License Agreement. Once this notice was received, all defendants lost their limited right to use the Bowmar name or trademark in any fashion. *Coit Drapery Cleaners, Inc. v. Coit Drapery Cleaners of New York, Inc.*, 423 F.Supp. 975, 978 (E.D. N.Y.1976). No evidence has been presented indicating that this termination was revoked during the time that the parties were attempting to negotiate or settle their dispute. Accordingly, the defendants' use of Bowmar's name or mark on *any* product, including watches and calculators, after the termination was received, was unauthorized and constitutes further trademark infringement. *See Oleg Cassini, Inc. v. Couture Coordinates, Inc.*, 297 F.Supp. 821, 827 (S.D. N.Y.1969).

*Unfair Competition*

■ Bowmar claims that all the defendants committed acts of unfair competition. Because, "the law of trademark infringement is but a part of the law of unfair competition, and the same test is applied in determining each claim," the Court need not address this cause of action at length. *American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 664 (2d Cir. 1979) (citations omitted). Bowmar's unfair competition claim is "absorbed" in the Court's finding of trademark infringement for the latter is a "subdivision" of the broader law and both are governed by the same principles. *James Burrough Ltd. v. Sign of Beefeater, Inc.*, *supra*, 540 F.2d at 274 n.16; *Fieldcrest Mills, Inc. v. Couri*, 220 F.Supp. 929, 933 (S.D.N.Y.1963). On the basis of its rulings on Bowmar's trademark claims, the Court concludes that the plaintiff is entitled to summary judgment on its unfair competition cause of action.

*Default Judgment*

Bowmar seeks a default judgment against Continental and CMI for failure to meet their discovery obligations. The motion is granted.

■ Federal Rule of Civil Procedure ("Rule") 37(d) authorizes a court to enter a default judgment against a party that fails to appear for a deposition or to respond to interrogatories and requests for document production. *See* Fed.R.Civ.P. 37(b)(2)(C). This "severe disciplinary measure" may be employed when a party's failure to respond constitutes willfulness, bad faith, or gross negligence. *Cf. Cine Forty–Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1066–67 (2d Cir. 1979) (precluding the introduction of evidence on damages which was "tantamount to [a] dismissal of [the damage] claim"); *Szilvassy v. United States*, 82 F.R.D. 752, 755–57 (S.D. N.Y.1978) (dismissing complaint for willful disregard of discovery rules and Court orders). Noncompliance with a court order is not a prerequisite to imposing sanctions under Rule 37. *Szilvassy v. United States*, *supra*, 82 F.R.D. at 755.

■ Both Continental and CMI have failed to appear for depositions and to produce documents requested by the plaintiff. Neither party has requested an adjournment or communicated with the Court regarding their failure to respond. Counsel for Continental has informed the plaintiff and Magistrate Gershon that Continental intends to default on its discovery obligations and has signed a letter confirming that position. CMI has no counsel and is now defunct; none of its former principles have indicated that a response will be forthcoming.

The Court concludes that the defendants' failure to respond constitutes gross negligence and a willful disregard for the discovery rules governing this litigation. A default judgment is thus appropriate in this case.

A default judgment should also be imposed against CMI for failure to comply with this Court's January 18, 1979 Order to retain new counsel and file a notice of appearance within thirty days. CMI has never complied with this Order and has never explained its failure to do so to the Court. The Order expressly stated that a default order would result from noncompliance. Accordingly, CMI is held to be in default on this second ground.

### Counterclaims

The answer served by CMI and Global asserted three counterclaims. Global has presented no facts supporting these claims and they are substantially refuted by the evidence presented to the Court. Accordingly, these claims are dismissed.

The first counterclaim alleges that Bowmar engaged in willful and malicious conduct that severely damaged the defendants' business and reputation. No evidence regarding specific acts committed by the plaintiff have been introduced, nor have the defendants demonstrated that they were damaged in any way. To the extent this claim sounds in malicious prosecution, it does not state a cause of action because this lawsuit has not resulted in a judgment for the defendants. *See Heaney v. Purdy*, 29 N.Y.2d 157, 160–61, 324 N.Y. S.2d 47, 49, 272 N.E.2d 550, 552 (1971). Finally, the settlement previously agreed to by the defendants cannot form a basis for a counterclaim alleging damage to their reputation.

The second counterclaim alleges that Bowmar failed to maintain a repair and service center as it was obligated to do under the Agreement. Again, no evidence supporting this claim has been introduced and the Court has previously ruled that Bowmar rightfully terminated the Agreement in September 1977.

The third counterclaim alleges that the plaintiff "wrongfully attempted to interfere with and terminate the . . . agreement." This allegation is contrary to the facts and has already been refuted by the Court's finding that Bowmar was entitled to terminate the Agreement.

The counterclaims asserted by Global and CMI are dismissed.

### Damages and Fees

Section 35 of the Lanham Act, 15 U.S.C. § 1117, provides that a prevailing plaintiff in a trademark infringement action is entitled to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The amount recovered is "subject to the principles of equity." *Id.*; *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1344 (2d Cir. 1975). In assessing profits, the plaintiff need only prove the defendant's sales and the defendant must establish all costs or deductions claimed. In assessing damages, according to the circumstances of the case, the court may award more than the actual damages shown, not exceeding three times that amount. If the court finds that recovery based on profits is either inadequate or excessive, it may, in its discretion, enter judgment for an amount deemed just. The sum awarded shall constitute compensation, not a penalty. In "exceptional cases," the court may award reasonable attorneys' fees to the prevailing party.

The Court agrees that Bowmar is entitled to the profits defendants reaped from the unauthorized sale of Bowmar products. The Court disagrees, however, with the dollar amount claimed by the plaintiff. Bowmar is entitled to recover the profits derived by Continental, CMI, and Global from the sale of (1) "Bowmar" video games, (2) "Bowmar" smoke detectors, and (3) Bowmar watches and calculators that were purchased after September 28, 1977, the date that Bowmar rightfully terminated the Licensing Agreement. *See W. E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 664 (2d Cir. 1970). Arguing that CMI was never a valid licensee, Bowmar contends that it is also entitled to the profits received by CMI and Global from the pre–termination date sale of watches and calculators. This argument, however, does not take into account the close connection and overlap-

ping operations between CMI and Continental, the licensee. Continental, not Bowmar, held the trademark rights during that period and apparently transacted business in conjunction with CMI. The profits derived cannot conceivably be viewed as Bowmar's loss. *See Quabaug Rubber Co. v. Fabiano Shoe Co.*, 567 F.2d 154, 162 (1st Cir. 1977). Finally, Bowmar has not established that CMI did not acquire licensee rights from Continental, as Iroff contends. *See* Iroff Aff. ¶ 3. Accordingly, the Court concludes that profits derived by the defendants from the sale of watches and calculators prior to September 28, 1977 should not be recovered by Bowmar.

Nor is Bowmar entitled to treble damages in this action. The plaintiff claims recovery on the basis of defendants' profits; no actual damages apart from that figure have been established. Treble damages cannot be awarded in the absence of an evidentiary basis for actual damages. *Caesars World, Inc. v. Venus Lounge, Inc.*, 520 F.2d 269, 274 (3d Cir. 1975). Furthermore, the Court does not find that the circumstances of this case would warrant such relief in light of the minimal monetary loss suffered by Bowmar.

Bowmar should recover the attorneys' fees that it incurred in making this motion for summary judgment. The defendants deliberately used plaintiff's trademark in the face of numerous complaints and Bowmar was forced to pursue this litigation because protracted settlement negotiations fell through. *See Amana Society v. Gemeinde Braus, Inc.*, 417 F.Supp. 310 (N.D.Iowa), *aff'd*, 557 F.2d 638 (8th Cir.), *cert. denied*, 434 U.S. 967, 98 S.Ct. 511, 54 L.Ed.2d 454 (1977). This award does not include attorneys' fees incurred prior to the time that the case was restored to the active calendar. The plaintiff had discontinued the action and it appears that all parties were making some effort to reach an amicable settlement. Bowmar chose at that time to accept the defendants' representations and forego litigation. Attorneys' fees, therefore, would not have been appropriate at that stage of the litigation and the Court is reluctant to award the costs incurred at that time on the basis of subsequent developments. Costs, in contrast, should be awarded with respect to the entire action because the Lanham Act does not limit such an award to "exceptional cases" but makes it one of the routine elements of a prevailing plaintiff's recovery.[2]

The matter is referred to Magistrate Nina Gershon for an accounting of the defendants' profits and an assessment of the costs and attorneys' fees.

*Conclusion*

Bowmar's motion for summary judgment against defendants Continental, CMI, and Global is granted. The plaintiff has successfully established its trademark claims, the defendants' violation of New York's anti–dilution law, and Continental's breach of the License Agreement.

A default judgment is entered against Continental and CMI for failure to comply with the plaintiff's discovery requests. CMI is also in default for failing to comply with this Court's order to retain new counsel.

The counterclaims asserted by Global and CMI are dismissed.

Bowmar is entitled to recover the profits received by the defendants from the unauthorized sale of Bowmar–labelled products. Bowmar is also awarded the costs incurred in pursuing this action and the attorneys' fees incurred in making this motion for summary judgment. The matter is hereby referred to Magistrate Nina Gershon for an accounting of defendants' profits and a determination of appropriate costs and attorneys' fees.

So ordered.

---

2. Bowmar was previously awarded the costs incurred in making the motion to restore the case to the active calendar. Half of that amount was paid to Bowmar by Continental. No payment has been made by Global and CMI and they remain liable for the outstanding amount. *See* Feigenbaum Aff. ¶ 8. The amount paid by Continental must be deducted in determining the costs now owed to the plaintiff.