**EL GRECO LEATHER PRODUCTS COMPANY, INC. d/b/a Candie's International, Plaintiff-Appellant, Cross-Appellee,**

v.

**SHOE WORLD, INC., d/b/a Gussini, Defendant-Appellee, Cross-Appellant.**

No. 1036, Dockets 86–7032, 86–7038.

United States Court of Appeals, Second Circuit.

Argued March 31, 1986.

Decided Dec. 3, 1986.

J. Joseph Bainton, New York City (Reboul, MacMurray, Hewitt, Maynard & Krostol, of counsel), for plaintiff-appellant, cross-appellee.

Edward V. Filardi, New York City (Brumbaugh, Graves, Donohue & Raymond, of counsel), for defendant-appellee, cross-appellant.

Before KEARSE, PRATT, and ALTIMARI, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

This appeal presents an issue under § 32 of the Lanham Act, 15 U.S.C. § 1114, specifically, whether goods manufactured by agreement with the holder of a trademark, but distributed without authorization of the holder, may be considered "genuine" for purposes of trademark protection. Because we conclude that such goods cannot be considered genuine, we reverse.

## BACKGROUND

On March 17, 1983, Solemio, a Brazilian shoe factory, contracted with El Greco Leather Products Company, Inc. to manufacture 25,000 pairs of shoes bearing El Greco's trademark, CANDIE'S. Solemio was to ship the shoes no later than June 15, 1983, in seven lots, A through G, each consisting of approximately 3600 pairs. Upon each shipment, El Greco was to pay Solemio $7.10 per pair, through a letter of credit. El Greco's agent in Brazil, Sapatus Assessoria e Lancomentos Ltd. ("Sapatus"), was to inspect the shoes before shipment in order to assure that they met El Greco's specifications and quality standards. Payment under the letter of credit could not be made without a certificate of inspection signed by Sapatus on behalf of El Greco, declaring that the merchandise had been "approved for shipment in accordance with buyer's delivery and quality specifications."

It soon became apparent that El Greco was not satisfied with Solemio's performance. Whether due to inferior quality or production delays, El Greco eventually cancelled its order for the last two lots, F and G, and transferred those orders to another factory. The official reason given by El Greco was production delays which had made it impossible for Solemio to deliver by the June 15th deadline; but it is unclear whether these delays were, in turn, caused by quality-control problems or simply an inability to produce the required output by the required date. In either case, no certificate of inspection was ever issued for the shoes Solemio manufactured for lots F and G.

Despite the cancellation, the shoes that were to be shipped as lots F and G were apparently manufactured by Solemio. The district court found that they had in fact been completed, at least in substantial part, at the time El Greco cancelled its order, and that El Greco did not specifically instruct Solemio on how to dispose of the shoes.

Solemio then sold the shoes, through an intermediary, to defendant Shoe World, Inc. All told, Shoe World purchased just over 7000 pairs bearing the CANDIE'S trademark at $4.00 per pair, F.O.B. Brazil, or $3.10 less than the original price paid by El Greco. Shoe World resold the CANDIE'S shoes for $13.88 per pair, the uniform price it charged for all shoes sold in its retail stores.

In October 1983 El Greco, which was selling its "current" style of CANDIE'S shoes for $35.00, learned that Shoe World was selling the same shoes for $13.88. Knowing that El Greco had never sold the shoes to Shoe World, on October 27, 1983, Charles Cole, president of El Greco, telephoned Paul Gussin, the president of Shoe World, inquiring as to where Shoe World had obtained the shoes and demanding that Shoe World discontinue selling them. Shoe World continued to sell the shoes.

Shortly thereafter, El Greco brought this suit, alleging trademark infringement in violation of the Lanham Act, 15 U.S.C.

§§ 1114, 1125(a) and 1126(g), unfair competition, violation of New York Gen.Bus.L. §§ 368–b, 368–d and 279–n, and violation of the Genuine Goods Exclusion Act, 19 U.S.C. § 1526.

## DECISION BELOW

After a trial in January 1984 the district court on December 21, 1984, dismissed El Greco's complaint for a permanent injunction barring Shoe World from using the CANDIE'S mark on any goods sold by it. *El Greco Leather Products Co. v. Shoe World, Inc.*, 599 F.Supp. 1380 (E.D.N.Y. 1984). On the Lanham Act claims, the court held that the shoes in question were genuine within the meaning of the statute, and that their sale, even though unauthorized by El Greco, could not constitute a violation of § 1114 and § 1125(a). The court further found § 1126(g) unavailable to El Greco, a domestic corporation, because the section protects only "the trade or commercial names of any foreign national whose country of origin is party to any convention or treaty relating to trademarks". 599 F.Supp. at 1391.

The court went on to hold that no case of unfair competition had been made out, basing this holding on the conclusion that since the shoes were genuine CANDIE'S shoes, there was no "likelihood of confusion" of the buying public. From this conclusion the court reasoned that there was also no trademark infringement under New York law, nor violation of New York General Business Law § 279–n.

Finally, the court rejected El Greco's claim under § 526 of the Tariff Act of 1930, the Genuine Goods Exclusion Act, 19 U.S.C. § 1526. The court concluded that § 526 applied to situations in which a trademark is held by one party in the United States and another party elsewhere; that there was no holder of the CANDIE'S trademark other than El Greco; that the statute was designed to prevent importation of products of a second holder which could validly be sold under the trademark elsewhere, but not in the United States; and that since the shoes at issue here were

manufactured not by or for some second holder of the CANDIE'S trademark but rather for El Greco itself, no claim was established under § 526. This appeal followed.

## DISCUSSION

The heart of this case is whether the shoes at issue were "genuine" for purposes of the Lanham Act. We conclude that the district court erred as a matter of law when it held that the CANDIE'S shoes being sold without El Greco's permission or even knowledge were "genuine" CANDIE'S shoes.

### A. The Genuineness of the Shoes Sold by Shoe World.

In order to make out a claim for trademark infringement, a holder must show, inter alia, that the alleged infringement is "likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a). Shoe World strenuously urges that the sale of "genuine" goods cannot give rise to the necessary likelihood of confusion, citing Monte Carlo Shirt, Inc. v. Daewoo International (America) Corp., 707 F.2d 1054 (9th Cir.1983), and DEP Corp. v. Interstate Cigar Co., 622 F.2d 621, 622 n. 1 (2d Cir.1980). Even if this is so, however, the goods sold by Shoe World cannot be considered genuine.

One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark. Menendez v. Faber, 345 F.Supp. 527 (S.D.N.Y.1972), aff'd in relevant part and modified, 485 F.2d 1355 (2d Cir.1973), modification rev'd sub nom. Alfred Dunhill, Inc. v. Republic of Cuba, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976). For this purpose the actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain. Professional Golfers Association of America v. Bankers Life & Casualty Co., 514 F.2d 665, 670–71 (5th Cir.1975).

The holder of a trademark is entitled to require, as El Greco did here, that no merchandise be distributed without its first being inspected by the holder or its agent to insure quality. Here, not only did El Greco not waive the right to such inspection, it required the inspection certificate as a condition for Solemio to draw upon the letter of credit.

The original order placed by El Greco specifically restricted distribution of the shoes with the CANDIE'S mark. As the district court noted, "No shoes are approved or accepted unless and until a principal of Sapatus [El Greco's agent in Brazil] signs an Inspection Certificate certifying that the lot of shoes to which it relates fully complies with [El Greco's] standards and specifications." 599 F.Supp. at 1384. It is undisputed that no such certificates of inspection were ever signed or issued with respect to lots F and G.

The certificates of inspection required in this case were an integral part of appellant's effort at quality control. Earlier inspections by Sapatus of the shoes that eventually comprised lots A–E resulted in some shoes being rejected, and in changes in the procedures being followed in production. 599 F.Supp. at 1385. While we accept as not clearly erroneous the conclusion of the district court that poor quality was not the reason lots F and G were cancelled, the inspection step was nevertheless an integral part of El Greco's procedure for determining whether to accept shoes and allow them to be sold under its trademark.

The district court concluded the shoes were "genuine" because they had been manufactured pursuant to an order by El Greco, the undisputed holder of the CANDIE'S trademark, and because El Greco did not specifically instruct Solemio on how to dispose of the shoes once it cancelled the order.

This is an unjustifiably narrow view of the protection afforded trademark holders by the Lanham Act. The mere act of ordering a product to be labeled with a trademark does not deprive its holder of the right to control the product and the

trademark. It is true that El Greco did not, at the time it cancelled the last two lots of its order, give instructions on how to dispose of the shoes that had already been manufactured and affixed with the CANDIE'S trademark. But we do not view such a step as necessary on the facts presented here.

■ Once it cancelled the order, El Greco was entitled to assume that Solemio would not dispose of the shoes without either removing the CANDIE'S trademark (as in the custom and practice in the industry), or affording El Greco an opportunity to inspect the goods and certify their quality prior to disposal, or, at the minimum, seeking instructions from El Greco on how to dispose of them. Since Solemio, at best, received no instructions from El Greco, this case is distinguishable from *Diamond Supply Co. v. Prudential Paper Products Co.*, 589 F.Supp. 470 (S.D.N.Y.1984), wherein the trademark holder specifically instructed the manufacturer that he "did not care" how the cancelled goods were disposed of. 589 F.Supp. at 474. No similar waiver here was given, or even sought.

B. *The District Court's Disposition of Appellant's Claims.*

The district court's dismissal of appellant's claims were based largely on its erroneous conclusion that the shoes in question were genuine and therefore that sale of them could not cause confusion. Since we conclude that the shoes were not genuine CANDIE'S shoes, it is plain that appellant has made out a violation of § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1). That section provides:

Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale ... of any goods or services on or in connection with which such use is likely to cause confusion.... shall be liable in a civil action by the registrant....

15 U.S.C. § 1114(1).

El Greco is entitled to relief under this provision. The shoes sold by Shoe World were not genuine CANDIE'S shoes, and El Greco never gave its consent to the use of the mark on those shoes. Even though Shoe World was involved neither in the manufacture nor the affixing of the CANDIE'S trademark to the shoes, its sale of the shoes was sufficient "use" for it to be liable for the results of such infringement and its claimed lack of knowledge of its supplier's infringement, even if true, provides no defense. *See De Acosta v. Brown*, 146 F.2d 408, 410–12 (2d Cir.1944), cert. denied, 325 U.S. 862, 65 S.Ct. 1198, 89 L.Ed. 1983 (1945); *Bowmar Instrument Corporation v. Continental Microsystems, Inc.*, 497 F.Supp. 947, 957 (S.D.N.Y. 1980); 2 J. McCarthy, *Trademarks and Unfair Competition* § 25.5, at 179 (2d ed. 1984); 3 M. Nimmer on Copyright ¶ 13.08, at 13–136, 13–138 (1986). Shoe World made no inquiry, and certainly had no reason to believe that El Greco was aware or had approved of its use of the mark. Shoe World could have easily ascertained whether the shoes in question were genuine.

■ We find it unnecessary to pass upon appellant's remaining claims of trademark infringement, unfair competition, and a violation of the New York General Business Law. Appellant is entitled to the permanent injunction it seeks and to a remand for a determination of damages based solely on the Lanham Act violation.

No. 86–7032 is reversed and remanded. No. 86–7038, denying Shoe World's motion for sanctions pursuant to rule 11, Fed.R. Civ.P., 623 F.Supp. 1038, is affirmed.

ALTIMARI, Circuit Judge, concurring in part and dissenting in part:

I most respectfully dissent from the opinion of the majority which reverses the district court's decision and remands for a hearing on the question of damages. I concur, however, in so much of the decision

as affirms the district court's denial of Rule 11 sanctions.

The majority concludes as a matter of law that the shoes, although manufactured at the direction of the plaintiff-trademark holder and labelled, as authorized, with plaintiff's federally registered trademark, were not genuine CANDIE'S shoes, and thus that the sale of these shoes constituted trademark infringement. The majority's classification of the question of genuineness as one of law rather than of fact and its underinclusive definition of genuine prompts this dissent. More generally, I disagree with the application of federal trademark law to cases, such as the instant one, in which a retailer purchases goods bearing a registered trademark from a manufacturer who is under contract with the trademark owner to produce those goods and who is authorized to affix the trademark.

### 1. *Finding of Fact—Genuineness*

Trademark infringement actions by their nature require courts to weigh and resolve factual questions and thus are subject to review under the "clearly erroneous" standard of Federal Rule of Civil Procedure 52(a). *See Sheila's Shine Products, Inc. v. Sheila Shine, Inc.*, 486 F.2d 114, 122 (5th Cir.1973). Courts must for instance resolve the ultimate factual question in trademark infringement cases of "whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused as to the source of the goods in question." *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44; 47 (2d Cir.1978) (citing Maternally Yours, Inc. v. Maternity Shop, Inc., 234 F.2d 538, 542 (2d Cir.1956), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). When evaluating the likelihood of such confusion, courts apply the factors laid out in the well-known case of *Polaroid Corp. v. Polaroid Electronics Corp.*, 287 F.2d 492 (2d Cir.), *cert. denied*, 368 U.S. 820, 825 S.Ct. 36, 7 L.Ed.2d 25 (1961):

Where the products are different, the prior owner's chance of success is a function of many variables: the strength of his mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers.

*Id.* at 495 (citing Restatement of Torts §§ 729–731). The assessment of these factors consistently has been held to be a question of fact reviewable under the clearly erroneous standard, *see, e.g., Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1004 (2d Cir.1983), and only the question of the "relative weight ... of [these] findings is reviewable ... as a matter of law." *Id.* at 1005 (citations omitted).

Courts must consider factual questions closely akin to those raised when evaluating the likelihood of purchaser confusion when determining whether a product is genuine: similarity of the marks, product proximity and quality. Determinations of genuineness, in addition, frequently necessitate an assessment of another factual question—the trademark owner's intent when farming out its manufacturing and labelling duties. In the instant case, the district court sifted through evidence regarding the following questions: authorization to manufacture and label, the extent that the goods were completed, the quality of the product, and the nature of the instructions given as to the disposal of cancelled goods. *See generally Anderson v. City of Bessemer City, North Carolina,* 470 U.S. 564, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985) (where disputed questions of fact exist, district court's findings subject to clearly erroneous standard even if based on physical or documentary evidence rather than on credibility determinations). Accordingly, I suggest that the question of genuineness should have been reviewed by the majority not as a question of law but instead as a question of fact subject to the "clearly erroneous" standard.

## 2. *"Genuineness"*

The majority in considering whether the shoes at issue were "genuine" focuses on the fact that the plaintiff-trademark owner had not given its final stamp of approval, in the form of an inspection certificate, to the manufactured goods. The majority holds that in the absence of such an inspection certificate, which the majority characterizes as "an integral part of the [trademark owner's] effort at quality control," the goods were distributed in an unauthorized manner and thus could not be considered genuine. I submit that this holding is incorrect and thus would affirm the district court's decision.

Generally, goods are characterized as either "genuine" or "spurious", with the former designation indicating that the goods are of a "reputed ... quality" or are "actually produced by or proceed[ ] from the alleged source," Webster's Ninth New Collegiate Dictionary 512 (1984), and the latter connoting a "deceitful nature or quality" or a "falsified or erroneously attributed origin." *Id.* at 1143; *see Monte Carlo Shirt, Inc. v. Daewoo International (America) Corp.*, 707 F.2d 1054, 1058 (9th Cir.1983) (Genuine products are "planned and sponsored by [the trademark holder] and produced for it on contract for future sale."); *see also* 3A Callmann, Unfair Competition Trademarks and Monopolies § 21.06 at 23 (L. Altman 4th ed. 1983) (Genuine goods are those "which emanate from the plaintiff or his affiliates.").

As long as the goods are manufactured under the direction of the trademark owner, bear the trademark registered and issued by the trademark owner, and are not of an inferior quality, the products are considered genuine. It is not necessary to a finding of genuineness that the goods be distributed with the trademark holder's express authorization. *See Olympus Corp. v. United States*, 792 F.2d 315, 321 (2d Cir.1986) (goods manufactured and marked abroad by parent of trademark holder and imported without permission adjudged genuine since they did not bear "counterfeit or spurious trademarks"); *Monte Carlo*, 707

F.2d 1054 (goods manufactured according to trademark owner's specifications and bearing its label but distributed to discount retailers without permission of trademark owner deemed "genuine"); *DEP Corp. v. Interstate Cigar Co.*, 622 F.2d 621, 621 & 622 n. 1 (2d Cir.1980) (goods considered genuine as there was "no difference between the product sold by [trademark owner] and that sold by [alleged infringer]," although source of goods not trademark owner but "European middlemen"); *cf. Adolph Coors Co. v. A. Genderson & Sons, Inc.*, 486 F.Supp. 131 (D.Colo.1980) (unauthorized sale of beer manufactured and trademarked by trademark owner constituted an infringement since sold in a damaged and inferior condition).

In the instant case, the plaintiff-trademark owner contracted with Brazilian manufacturers for the production of its shoes, and as part of this arrangement permitted the manufacturers to affix its trademark labels to the shoes. The manufacturers completed and labelled the shoes as specified, but as the district court found, the order was cancelled not for substandard quality but for the "reason of late delivery *only.*" No directions regarding the disposal of such cancelled goods were provided to the manufacturers, nor were the manufacturers unambiguously restricted from independent distribution. Most importantly, the facts indicate that the shoes were not inferior imitations produced by defendant or an entity independent of the trademark owner. The goods were not altered, reconditioned, repackaged, or resold. *See Champion Spark Plug Co. v. Sanders*, 331 U.S. 125, 67 S.Ct. 1136, 91 L.Ed. 1386 (1947); *see generally Callmann, supra* § 21.13–16 at 62–73.

As Justice Holmes stated,

A trade mark only gives the right to prohibit the use of it so far as to protect the owner's good will against the sale of another's product as his. . . . When the mark is used in a way that does not deceive the public we see no such sanctity in the word as to prevent its being used to tell the truth.

*Prestonettes, Inc. v. Coty*, 264 U.S. 359, 368, 44 S.Ct. 350, 351, 68 L.Ed. 731 (1924) (citations omitted). The defendant did not attempt to deceive purchasers. Instead, the defendants, in what appears to be good faith, purchased shoes of a good quality from a manufacturer who was under contract with the trademark owner to produce the shoes and affix labels to them. Based on these facts, I would not impose liability on defendant-retailer for trademark infringement and would affirm the district court's decision in its entirety.