**ENERGY JET, INC., Plaintiff,**

v.

**FOREX CORPORATION, Defendant.**

Civ. A. No. 83–2476.

United States District Court,
E.D. Michigan, S.D.

May 11, 1984.

James J. Walsh, Barbara B. Bluford, Detroit, Mich., for plaintiff.

Stephen K. Valentine, Jr., West Bloomfield, Mich., for defendant.

## ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

JULIAN ABELE COOK, Jr., District Judge.

Plaintiff, Energy Jet, Inc., commenced this action to enjoin Defendant, Forex Corporation [Forex], from using the trademark "Energy Jet" on air replacement ventilation systems and to otherwise enjoin Forex from infringing upon its trademark which is registered to Energy Jet, Inc. in Canada and in the United States.[1] Forex counterclaimed, asserting that Energy Jet, Inc. is not the owner of the disputed trademark. Rather, Forex contends that it is the entity with whom consumers associate the Energy Jet trademark, which is imbued with Forex's "good will" and reputation. Forex contends that it is the true owner of the subject trademark in the United States and that the Court should enjoin Energy Jet, Inc. from use of the trademark "Energy Jet."

The matter was set for an evidentiary hearing which was conducted over several weeks. Each party presented witnesses and documents in support of their respective positions. This Memorandum Opinion represents this Court's Findings of Fact and Conclusions of Law, pursuant to *Fed. R.Civ.P.* 52(a).

## FINDINGS OF FACT

Plaintiff, Energy Jet, Inc., is a Canadian corporation that was incorporated under the Canada Business Corporation Act. It is a subsidiary of another Canadian corporation; to wit, Dunford-Liscio, Inc. [Dunford-Liscio].

Defendant, Forex Corporation [Forex], is a Michigan corporation. Defendant, James F. Hall [Hall], is President and sole stockholder of Forex.[2]

Prior to 1980, Dunford-Liscio manufactured unfired air makeup systems for Solaquaire, a Canadian Company. These sys-

---

1. The Complaint, which was filed by Energy Jet, Inc. alleged that Forex (1) infringed upon its trademark, in violation of 15 U.S.C. § 1114, (2) engaged in unfair competition in violation of 15 U.S.C. § 1125(a), (3) engaged in common law unfair competition, (4) breached a contract between Forex and Energy Jet for the marketing of air replacement systems, and (5) asserted a claim for payment for goods sold and delivered to Forex. The Complaint prayed for preliminary and permanent injunctive relief, as well as damages. The present Motion for Preliminary Injunction is limited in scope and the Court will address only those issues that are necessary to the resolution of this motion.

2. Initially, Plaintiff also joined Dillon Industrial Fan Company as a party Defendant. Plaintiff has since dropped its claim against Dillon and, accordingly, it will be dismissed from this action.

tems are energy conservation devices that replace air in a structured environment through the action of its two main components; to wit, a fan unit that propels air, and a duct unit that distributes the air. Solaquaire distributed the systems under the "Multi-Jet" trademark through Forex in the United States and through Henlex, Inc. [Henlex] in Canada.

In early 1979, Hall, in his capacity as President of Forex, concluded that he was no longer interested in being a distributor for Solaquaire because the price of the Multi-Jet units was not competitive. After Solaquaire terminated its relationship with Dunford-Liscio, Henlex decided that it would no longer represent Solaquaire as a distributor of Multi-Jet units in Canada.

In February of 1979, Hall retained an attorney to undertake a patent search on the Multi-Jet name. He was advised that the name might be available for registration. Nevertheless, Hall determined that he did not wish to use the Multi-Jet name and, accordingly, did not pursue the matter further. Hall undertook a new search for the name of Ener-Jet and, on September 20, 1979, instructed his attorney to institute a patent and trademark search under that name. On the basis of that search and the opinion of his attorney, Hall decided that the registration of Ener-Jet was not feasible.

Thereafter, Hall, Gerald Lemieux (the principal stockholder of Henlex), and John Dunford [Dunford] (a principal stockholder of Dunford-Liscio) held several meetings at Dunford's offices to discuss the manufacture and distribution of an unfired air makeup system without the participation of Solaquaire. In the course of these meetings, the parties discussed various potential trade names. The trade name of Energy Jet was chosen by Dunford despite Hall's belief that he had searched the Ener-Jet name and determined that it was unavailable for use. These meetings culminated in an informal understanding that Dunford-Liscio would continue to manufacture the air replacement systems and distribute them directly through Forex and Henlex.

The parties did not reach an agreement regarding the ownership of the Energy Jet trademark.

In a letter, dated February 8, 1980, from Dunford to Henlex, he proposed that (1) Henlex would be the distributor of the Dunford-Liscio air replacement system in Quebec and Eastern Ontario, and (2) the system would be manufactured by Energy Jet, Inc.

On February 13, 1980, Dunford wrote to Hall and proposed that Forex would be the distributor of the Energy Jet system in the United States. The letter stated:

Dear Sir:

Further to our recent telephone conversation we would like to confirm our understanding and commitment of the following:

(a) Our associated company Energy-Jet Inc. will manufacture and supply energy related air replacement equipment to Forex Corporation as exclusive manufacturers representative for the United States market.

(b) Forex Corporation will purchase and distribute only, Energy Jet Products for air replacement, from Energy-Jet Inc.

(c) It is understood that the name Energy-Jet Inc. will be used on all sales brochures and other advertising. Co-op advertising local and national will be accepted on the basis of 50/50 cost sharing. Mutual effort and acceptance would be required on the advertisement material and wording.

(d) Any agreement that may be made with Solaquair Corporation now or in the future will not effect our supplying of equipment or change our commitment with Forex Corporation.

With your acceptance of the above we can proceed with a formal agreement.

Very truly yours,
DUNFORD–LISCIO
(ONTARIO) INC.
John Dunford
President

Lemieux responded to the Dunford communication on February 27, 1980, in which he said:

Dear John:

In reply to your letter of February 8, 1980, we wish to advise that we would be happy to represent Energy Jet, Inc. for Quebec and Eastern Ontario.

I will be meeting Jim Hall in Toronto on March 5th and 6th at which time we both will be to see you to discuss the matter further.

We will also bring with us our notes on what we feel should be included in the initial sales brochure.

Yours very truly,

Henlex, Inc.

G.A. Lemieux, President

In a reply letter to Dunford, dated February 20, 1980, Hall expressed a difference in the understanding which had been reached at the prior meetings among the parties. The letter stated, in part: "I did not understand that Henlex and/or Forex would become involved with Dunford-Liscio to form a company you mention i.e., Energy-Jet, Inc. According to my understanding of our agreement, this should read Dunford-Liscio will manufacture the Energy Jet make-up air unit only for Henlex, Inc. and the Forex Corp. or put more simply Forex Corp. owns Energy-Jet in the United States and Henlex Ind. owns Energy-Jet in Canada and they own it jointly in all other territories." Moreover, Hall claimed that the provision, which required Forex to purchase and distribute only Energy Jet products from Energy Jet, Inc. was unacceptable. He stated that "it would prevent us from having anyone else manufacture the Energy Jet units and would require us to purchase all other air replacement equipment we are now marketing and distributing i.e. heat make-up air, supply fans and exhaust fans, etc. from Dunford-Liscio." In essence, Hall took issue with each of the proposals in the February 13, 1980 letter from Dunford. On the same day, Hall sent a handwritten letter to Lemieux, along with a copy of the Dunford letter of February 13, 1980 and Hall's reply

letter of February 20, 1980. Lemieux did not receive the letter until February 27, 1980. Dunford testified that he never received Hall's letter of February 20, 1980.

Despite the differences which had been expressed in Hall's letter, the parties proceeded to manufacture and market the Energy Jet system. Their subsequent conduct was consistent with the proposal in Dunford's letter of February 13, 1980. However, Forex chose not to utilize the cooperative advertising, which had been offered by Dunford in that correspondence.

Energy Jet, Inc. was incorporated on February 18, 1980. Thereafter, it applied for registration of the Energy Jet trademark in Canada and in the United States. The trademark was registered to Energy Jet, Inc. by the Canadian Register of Trademarks on July 31, 1981. Similarly, the United States Patent and Trademark Office registered the Energy Jet trademark on August 3, 1983.

Despite an expressed unequivocal statement in the February 13, 1980 letter that a formal agreement would follow upon Hall's acceptance of the terms which had been stated therein, no such formal agreement was prepared or sent. Moreover, Dunford did not seek or inquire of Hall's acceptance of the terms. The principals of Dunford-Liscio stated that they did not discuss the terms of the agreement with Hall again because of their desire not to formalize the agreement and commit themselves to Forex.

Since its incorporation in 1980, all air make-up systems, which were manufactured by Energy Jet, Inc., have been labeled with the "Energy Jet" trademark. The Company designed and paid for the labels. It was the only entity to affix labels to the Energy Jet units. The principal advertising of the Energy Jet system was a four page brochure which prominently displayed Energy Jet in conjunction with the logo. After 1980, the logo was changed. Nonetheless, on the last page of every new brochure, Energy Jet, Inc. is described as the manufacturer of the Energy Jet system. As Energy Jet's distribu-

tor, Forex gave these brochures to customers and potential customers. Forex is listed as a distributor on some of the brochures. On others, Forex is not mentioned.

When Forex learned that there were brochures which omitted its name and that of Henlex, there was an immediate protest to Dunford, who indicated that the only reason for the omission of the Forex and/or Henlex names from the brochure was due to the distribution of the brochures in a small territory in which direct sales from Energy Jet, Inc. were executed.

The Energy Jet brochures were prepared in Canada at the direction of Energy Jet, Inc. under its control and at its expense. Forex, Henlex and Energy Jet, Inc. participated in the design of the brochures. Forex paid for all of the brochures that were supplied to it. Forex ordered the brochures from Energy Jet, Inc. The first shipment of these brochures was made on May 23, 1980. Each shipment was accompanied by an invoice to Forex for the brochures that were sent.

Despite the proposal by Dunford that the parties cooperate on a 50/50 basis for national and local ads, it appears that Forex never sought such a contribution with respect to advertising in the United States. Hall testified that he did not want a shared advertising arrangement with Dunford. In his opinion, any potential contribution would be better applied to keeping manufacturing costs as low as possible.

Although Forex did not accept the offer from Energy Jet, Inc. to participate in cooperative advertising of the product line, it did expend substantial money in advertising and promoting the Energy Jet line on its own. In fact, with the exception of the brochures provided by Energy Jet, Inc., the advertising of the Energy Jet product line depended solely upon the efforts of Forex. Forex advertising was not limited, however, to the air make-up systems of Energy Jet, Inc. Forex also advertised other products which it sold. For example, Forex printed and distributed a one page sheet entitled "Partial List of Forex Unfired Make-up Air Customers" which identified one hundred businesses in the United States and Canada. The sheet did not contain the "Energy Jet" trademark and Hall admitted that not all businesses, which were listed on the sheet, purchased unfired make-up air systems from Forex.

From February 1980 until December 1982, Forex sold only Energy Jet replacement air systems. All such systems were plainly marked with the Energy Jet trademark which had been affixed by Energy Jet, Inc. prior to shipment.

Forex admitted that it never exercised any control over the quality of the Energy Jet systems which it sold. It appears that most of the systems were shipped directly from Canada. Forex did not possess any diagrams, drawings, blueprints or the like for the Energy Jet system.

In December 1982, Mar-Lyn Industrial Sales Company [Mar-Lyn], a sub-distributor of Forex, obtained a purchase order from the Pontiac Motor Division of the General Motors Corporation for a make-up air system. The designated shipping point was Rexdale, Ontario, the location of Energy Jet, Inc. Roscoe Goddard, Mar-Lyn's sales representative, presented the Energy Jet brochure to Jimmy DeBoo [DeBoo], the Pontiac Motor Division engineer, who ultimately made the decision to purchase the Energy Jet unit. The brochure represented that the Energy Jet system was manufactured by Energy Jet, Inc. A Pontiac Motor order for the acquisition of the make-up air system was placed with Forex. However, Forex did not transmit the order to Energy Jet, Inc., but had a similar unit fabricated by Dillon Industrial Fan Company [Dillon] in Canton, Ohio. The Dillon air replacement system, which was shipped directly to the Pontiac Motor Division and installed by its employees, did not display the Energy Jet trademark.

Forex did not control the quality of the products that had been obtained from Dillon. Hall testified that he did not furnish Dillon with plans, prints or diagrams in order for Dillon to construct the make-up of the air system.

Shortly thereafter, problems developed in the operation of the Dillon unit. DeBoo, believing the system to be an Energy Jet unit, called Energy Jet, Inc. In response, Dunford advised DeBoo that his make-up air system had not been installed by Energy Jet, Inc. and was not an Energy Jet unit. DeBoo, who was dissatisfied with the Dillon system, insisted that Mar-Lyn remove or replace it with an Energy Jet unit. The unit was then replaced with a system from Energy Jet, Inc.

Forex never informed Energy Jet, Inc. that it was using the "Energy Jet" trademark to sell products other than those manufactured by Energy Jet, Inc. Forex' advertising material indicated that the Energy Jet system was manufactured by Energy Jet, Inc. Energy Jet, Inc. did not learn of Forex' substitution until it received the call from DeBoo.

Thereafter, Energy Jet, Inc. notified Forex that it could not continue to serve as the distributor of the Energy Jet system. Whereupon, Forex placed stick-on labels over the name of Energy Jet on the last page of its brochures. Forex then continued to use the brochures in the distribution of air replacement systems.

## CONCLUSIONS OF LAW

The dispute in this case arises out of a claim by each party that it owns or has the exclusive right to use the "Energy Jet" trademark in the United States.

Registration of a trademark is prima facie evidence of the "registrant's ownership of the mark, and of the registrant's exclusive right to use the mark in commerce," 15 U.S.C. § 1057(b) and § 1115(a). The statute creates a rebuttable presumption in favor of the registrant which must be overcome by the party who challenges the mark, *Rolley, Inc. v. Younghusband,* 204 F.2d 209 (9th Cir.1973); *Victor Tool and Machine v. Sun Control,* 299 F.Supp. 868 (E.D.Mich.1968).

█ ·The manufacturer of goods is generally presumed to be the owner of the trademark of those goods. This is so even where the dispute is between a foreign manufacturer and a domestic distributor, *Hank Thorp v. Minilite, Incorporated,* 474 F.Supp. 228 (D.Del.1979).

It is well-settled that the question of ownership of a trademark as between the manufacturer of a product to which the mark is applied and the exclusive distributor of that product is a matter of agreement between them. In the absence of any such agreement, there is a legal presumption that the manufacturer is the owner of the mark. The general rule is also applied as between a foreign manufacturer and the exclusive United States distributor. That is, ownership of a trademark in the United States as between a foreign manufacturer and an exclusive United States distributor is a matter of agreement between them. In the absence of express or implied acknowledgement or transfer by the foreign manufacturer of rights in the United States, all rights to the trademark in the United States, are presumed to be in the foreign manufacturer. An exclusive U.S. distributor does not acquire ownership of a mark of a foreign manufacturer any more than a wholesaler can acquire ownership of a mark of an American manufacturer merely through the sale and distribution of goods bearing the manufacturer's trademark.

McCarthy, *Trademarks and Unfair Competition,* § 16.15 (1973). *See also Audioson Vertriebs-GmbH v. Kirsalter Audiosonics, Inc.,* 196 U.S.P.Q. 453 (TTAB 1977); *Jean D'Albert v. Henkel-Khasana G.m.b.H.,* 185 U.S.P.Q. 317 (TTAB 1975); *Bakker v. Steel Nurse of America, Inc.,* 176 U.S.P.Q. 447 (TTAB 1972); *Compania Insular Tabacalera v. Camacho Cigars, Inc.,* 167 U.S.P.Q. 673 (D.C.1971).

444 F.Supp. at 236.

█ In the absence of an agreement, an exclusive distributor may acquire a trademark over the claimed ownership of a manufacturer, *Rodgers v. Ercona,* 277 F.2d 94 (D.C.Cir.1960); *Spencer v. VDO Instruments, Limited United States,* 232 F.Supp.

735 (E.D.Mich.1964); see generally, *Bell and Howell: Mamiya v. Masel Supply,* 548 F.Supp. 1063 (E.D.N.Y.1982). Such rights may be acquired if the goods are manufactured for him, if he controls their production or if "they pass through his hands in the course of trade" and "he gives them the benefit of his reputation or of his name and business style." *Victor Tool, supra,* at 874; see *Wrist-Rocket Mfg. Co., Inc. v. Saunders Archery Co.,* 516 F.2d 846 (8th Cir.1975).

Forex contends that it is the owner of the Energy Jet trademark because Hall conceived of the Energy Jet name and Forex was the first to use the Energy Jet name in the United States. Forex also argues that it acquired the right to use the Energy Jet name by agreement with Dunford-Liscio. Moreover, Forex submits that even if an enforceable agreement did not exist, it is entitled to the use of the Energy Jet name in the United States because (1) the American public associates the Energy Jet air replacement system with Forex, and (2) substantial sums have been expended by it in promoting the Energy Jet trademark.

■ The clear weight of authority dictates that Forex' first argument must fail. The mere conception of a trademark does not give rise to ownership rights. The trademark must be used on, or in connection with, the sale or distribution of goods, *Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1916); *Rolley, Inc., supra; Victor Tool, supra; Watson v. E. Leitz, Inc.,* 254 F.2d 777 (D.C.Cir.1958).

Forex asserts that Hall, its chief executive officer, conceived of the Ener-Jet name early in 1979 and undertook a trademark search immediately thereafter. It is contended that Hall's idea was communicated to Dunford during his meeting with Dunford and Lemieux. Forex contends that it had every intention of registering the mark and, moreover, this fact was made known to Dunford and Energy Jet, Inc. through the February 20, 1980 letter from Hall to Dunford.

■ The authority cited above leads this Court to the inescapable conclusion that this argument must also be rejected. There is no indication in the present record that Forex used the Energy Jet trademark in connection with the sale or distribution of goods. Hall's inchoate plans for marketing an Energy Jet system are not sufficient to invoke the protection of the law. Similarly, the Court must reject Forex' claim that it was the first to use the Energy Jet trademark in the United States. Forex' contention is based solely on the fact that it ordered the Energy Jet labels from Energy Jet, Inc. on February 8, 1980, two months before Energy Jet, Inc. claimed that it initially used the mark in commerce. There is no evidence in this record that Forex used these labels in commerce prior to April 1980 or that the label was affixed to any product other than that which had been manufactured by Energy Jet, Inc. As the cases above illustrate, a trademark does not exist in gross. Thus, mere advertising is not sufficient to acquire trademark rights.

Forex also attempted to show that Energy Jet, Inc. was a fabricator of air replacement systems rather than a manufacturer of any particular type of system. It is Forex' position that Energy Jet, Inc. had specifically manufactured the air replacement system, which is at issue here, for Forex.

The only support for this position appears in the letter of February 20, 1980 from Hall to Dunford. In that letter, Hall expressed his understanding that Dunford-Liscio would manufacture an air replacement system for Forex which would own the Energy Jet mark in the United States.

This argument by Forex must fail for two reasons. First, it is apparent that the letter from Hall to Dunford does not constitute a contract. At best, this communication could be considered a counter-offer in response to the proposal that had been made by Dunford in his February 13, 1980 letter to Hall. A plain reading of these letters indicates that there was no meeting

of the minds with respect to the ownership of the Energy Jet trademark, or the marketing and manufacturing relationship between Dunford-Liscio and Forex. This Court cannot find that either of the letters constitutes an express contract between the parties. Therefore, any contractual relationship between the parties must be implied from their conduct and the circumstances which surround the manufacturing and marketing of the Energy Jet air replacement system, see *Erickson v. Goodell Oil Co., Inc.*, 384 Mich. 207, 180 N.W. 798 (1970).

■ The record reflects that the parties conducted business primarily along the lines of the proposal which had been set out in Dunford's February 13, 1980 letter. The only exception appears to be Forex' commitment to pay all of the advertisement costs in the United States rather than to share the costs as outlined in the Dunford letter. There is no indication that Energy Jet, Inc. manufactured the air replacement system to Forex' specification or that Forex had any control over the quality or design of the system. Even though Forex paid for the advertising brochures and labels, the actual labeling of the product was done at the Energy Jet, Inc. manufacturing site in Canada. The brochures explicitly stated that the Energy Jet system was manufactured by Energy Jet, Inc. and distributed by Forex.

On the basis of this record, the Court can only conclude that there was no agreement, expressed or implied, between the parties that the Energy Jet mark would be owned by Forex.

■ The same evidence also leads the Court to reject Forex' argument that it acquired the exclusive right to use the mark in the United States because (1) it is the exclusive distributor for Energy Jet, Inc. and (2) the public associates this air replacement ventilation system with the Forex name.

It is evident on this record that the public was placed on notice that the Energy Jet system was manufactured by Energy Jet, Inc. DeBoo testified that the unit, which was purchased by Pontiac Motors, had been manufactured in Canada by a Canadian Company (to wit, Energy Jet, Inc.), and would be shipped directly from Canada. The record simply does not support Forex' contention. To the contrary, the record shows that Forex was merely an exclusive seller who was not entitled to a claim which is superior to that of Energy Jet, Inc.

■ Forex also contends that Energy Jet, Inc. is barred by the doctrine of laches, estoppel and acquiesence from attempting to enforce its registration of the Energy Jet trademark. Forex asserts that "(t)he fact scenario set forth herein clearly establishes that the Plaintiff was guilty of laches, in not following the negotiated agreement as between the parties. By its own failure to submit a formal agreement as it said it would do in [its letter of September 13, 1980], the Plaintiff should be prohibited from asserting rights to the use of the name Energy Jet in the United States market. Had Plaintiff done so Defendants would have been on notice of the intention of Plaintiff to commandeer the name and would have taken appropriate action."

Forex seems to suggest that the Court should conclude that Energy Jet, Inc., by its conduct, lulled Forex into believing that it would not pursue registration of the trademark and, in fact, assured Forex that it would have the exclusive right to use the Energy Jet trademark in the United States. The record does not support such a finding. Thus, the Court will reject Forex' plea to invoke its equitable powers under the Lanham Act, 15 U.S.C. § 1069.

Forex also contends that the record supports a finding of concurrent registration and use of the Energy Jet trademark, pursuant to 15 U.S.C. § 1052(d).[3] It argues

---

**3.** Section 1052(d) provides, in part, "(c)oncurrent registration may also be issued by the Commissioner when a Court of competent jurisdic-

tion has finally determined that more than one person is entitled to use the same or similar marks in commerce.

that the Court should find that Energy Jet, Inc. is entitled to use the trademark in Canada and that Forex is entitled to use the trademark in the United States.

For reasons, which have been set forth earlier, Forex has no support for its argument that it was entitled to use the Energy Jet trademark. Thus, the Court need not reach the argument of the applicability, if any, of 15 U.S.C. § 1052(d).

On the basis of the state of this record, the Court must find that Forex has failed to rebut the presumption in favor of the registrant, Energy Jet, Inc., by 15 U.S.C. § 1057(b) and § 1115(a). Forex has failed to establish any rights in the use of the Energy Jet trademark on air replacement systems. Therefore, the Court determines that the presumption must stand and, for the purposes of this motion, Energy Jet, Inc. is hereby deemed to be the owner of the Energy Jet trademark.

Having made this determination, the Court must now consider the propriety of issuing a preliminary injunction. Plaintiff, Energy Jet, Inc., commenced this action under 15 U.S.C. § 1114 and 15 U.S.C. § 1125(a), as well as a claim for unfair competition under Michigan law. Plaintiff need only prevail on one of these claims to be entitled to a preliminary injunction.

In general, the movant must establish the following factors in order to prevail on a Motion for Preliminary Injunction:

(1) a likelihood of success on the merits,

(2) that irreparable injury will result if the injunction is not granted,

(3) the harm to the movant will outweigh any damage or harm that might inure to the non-moving party, and

(4) the public interest will not be adversely affected by the issuance of the injunction.

*Mason County Medical Association v. Knebel,* 563 F.2d 256 (6th Cir.1977).

However, on the basis of the contested legal issues in this case, the Sixth Circuit has adopted a slightly different standard to support a Motion for Preliminary Injunction.

> There must be a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.,* 670 F.2d 642, 651 (6th Cir.1982), quoting *Warner Brothers, Inc. v. Gay Toys, Inc.,* 658 F.2d 76 (2nd Cir.1981).

15 U.S.C. § 1114 makes it unlawful for any person to infringe upon a registered trademark. "A cause of action for the infringement of a registered mark in violation of 15 U.S.C.A. § 1114 exists where a person uses (1) any reproduction, counterfeit, copy or colorable imitation of a mark; (2) without the registrants consent; (3) in commerce; (4) in connection with the sale, offering for sale, distribution or advertising of any goods; (5) where such is likely to cause confusion, or to cause mistake or to deceive." *Boston Professional Hockey Association v. Dallas Cap and Emblem Manufacturing, Inc.,* 510 F.2d 1004, 1009–10 (5th Cir.1975).

The evidence, which was produced during the hearing, indicates that Forex continued to use the Energy Jet trademark in the sale and advertisement of air replacement units after having been notified by Energy Jet, Inc. that their marketing relationship had been terminated. Forex altered its existing inventory of Energy Jet brochures by masking the name of Energy Jet, Inc. which appeared on the back of those brochures. Later, Forex, while producing brochures with a slightly different logo, continued to represent to the public that the product for sale was an Energy Jet unit even though the unit was not manufactured by Energy Jet, Inc. Thus, this Court concludes that the first four ele-

ments under the *Dallas Cap* test have been established.

██ The remaining element requires that Energy Jet, Inc. establish that Forex' use of the Energy Jet trademark "is likely to cause confusion or to cause mistake or to deceive." Evidence of actual confusion is not necessary in an action for injunctive relief. Moreover, it is not required that the likelihood of confusion arise from intentional conduct. It is enough for the movant to show that the advertisements "tend to create a false impression," *Frisch's, supra*, at 647.

In the present case, Energy Jet, Inc. has shown the occurrence of actual confusion. The air replacement unit, which had been delivered to Pontiac Motors, was represented by Forex to be an Energy Jet unit when, in fact, it had been manufactured by Dillon. DeBoo testified that he believed the unit to be an Energy Jet unit and, when it did not operate properly, he contacted Energy Jet, Inc. in Canada for assistance.

██ The Court believes that, at this juncture, Energy Jet has fully satisfied all of the elements that are necessary for a claim under 15 U.S.C. § 1114.

Finally, Energy Jet, Inc. contends that the infringement upon a valued trademark is a per se irreparable injury.

There is ample case law to support the proposition that irreparable injury naturally flows from the infringement of a trademark. In *Processed Plastics Company v. Warner Communications, Inc.*, 675 F.2d 852 (7th Cir.1982), which was relied upon in *Frisch's, supra*, the Seventh Circuit recognized "that damages occasioned by trademark infringement are by their very nature irreparable and not susceptible of adequate measurement for remedy at law," at 858. The Court went on to note:

> As this Court recently explained in Ideal Industries, supra, this readiness to find injury arises in part from the realization

that "the most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the goods. Even if the infringer's products are of high quality, the plaintiff can properly insist that its reputation should not be imperiled by the acts of another" quoting L.R. Colmann "Unfair Competition, Trademarks and Monopolies," Section 88.3(b) at 205 (3rd ed. 1970). *Id.* *accord American Home Products Corporation v. Johnson Chemical*, 589 F.2d 103 (2nd Cir.1978).

The Court believes that the rationale of the Seventh Circuit is a sound one. Moreover, even if Energy Jet, Inc. is required to prove irreparable harm, it has met that burden here. The evidence shows that the harm, which resulted from Forex' conduct, is the inability of Energy Jet, Inc. "to control the nature and quality of the defendants goods." The testimony of DeBoo reveals that quality problems arose from the substitution of the Dillon unit in the place of the unit which had been manufactured by Energy Jet, Inc. In this instance, Energy Jet, Inc. has shown actual irreparable injury and, accordingly, it is entitled to the protection of the Lanham Act.

For these reasons, the Court determines that the Motion for Preliminary Injunction, which has been filed by Plaintiff, Energy Jet, Inc. is hereby granted.

IT IS SO ORDERED.