**IMAF, S.P.A., Plaintiff,**

v.

**J.C. PENNEY COMPANY, INC., Defendant.**

**No. 86 Civ. 9080 (CHT).**

United States District Court, S.D. New York.

Nov. 10, 1992.

Herzfeld & Rubin, P.C., New York City, (Peter J. Kurshan, of counsel), for plaintiff.

John B. Rizo, Sr., Legal Dept. (Weil, Gotshal & Manges, New York City, of counsel), for defendant.

## OPINION

TENNEY, District Judge:

Plaintiff IMAF, S.p.A. ("IMAF") brought this case in 1986 alleging breach of contract, tortious interference with contract, trademark infringement, and unfair competition by defendant J.C. Penney Company, Inc. ("Penney"). IMAF initially brought suit in state court, and the case was removed to federal court because of trademark claims based on the Lanham Act, 15 U.S.C. § 1051 *et seq.* (1982), over which this court has jurisdiction. *See* Memorandum Opinion and Order of Judge Kimba M. Wood, March 11, 1992, at 7 (denying IMAF's motion for remand to state court).

At a bench trial, after the close of IMAF's case, Penney moved for a directed verdict pursuant to Fed.R.Civ.P. 50. Penney's motion for directed verdict (now called judgment as a matter of law) is improper because Rule 50 applies only to jury trials. The court reserved decision, and will treat this motion under Rule 52.[1]

---

1. Prior to the 1991 amendments to the rules, if one moved for a directed verdict in a nonjury trial, the motion was treated under Rule 41. The rule was amended in 1991, and the relevant portions deleted, so that the rule could no longer be used "as a means of terminating a non-

## BACKGROUND

IMAF is an Italian knitwear manufacturer whose principal place of business is in Brescia, Italy. In the fall of 1984, IMAF contracted with Penney to manufacture women's sweaters for retail sale by Penney in the United States. Penney was conducting a "Salute to Italy" promotional campaign, and to correspond with that campaign Penney wanted the labels on the merchandise to have an Italian sounding name, rather than "IMAF." IMAF suggested the name "Adiansi," which is the surname of IMAF's principals, Mario ("Mario") and Elio Adiansi ("Elio"). Penney agreed to use of the Adiansi label. IMAF, however, gave no notice that it claimed, or intended to claim, any rights in the name Adiansi. According to Elio, who testified at trial, IMAF had used the name Adiansi as a label beginning in 1984. However, at least through 1986 no goods manufactured by IMAF and sold in the United States bore the name Adiansi. Penney was satisfied with the quality of the sweaters, and IMAF made no complaint about Penney's 1984 order.

In 1985 Penney turned to IMAF to fill another order, which totalled roughly 40,000 pieces at a price of $328,362. *See* Revised Joint Pre–Trial Order at 3. The orders were placed by Penney on February 22, 1985. Exhs. C & D. After contracting with IMAF, Penney sent specifications detailing the desired label—i.e., Adiansi—and retaining the right to make any changes. Exh. 95. Penney had ultimate control over the quality of the sweaters, as IMAF acknowledged in a telex discussing the order. Exh. R. In addition, Penney exclusively conducted the advertising for the sale of the sweaters. As the retail seller, Penney was responsible for returns and customer complaints. There were no words on the label that would identify the merchandise to the customer as having been manufactured by IMAF.

Shortly after Penney placed the 1985 order, and without Penney's knowledge or approval, IMAF subcontracted the order to Primavera, S.p.A., another Italian manufacturer.[2] Throughout the manufacturing period, Penney corresponded with IMAF through Penney's agent in Italy, Gallinaro Buying Services ("GBS").

Penney's contract with IMAF contained the following provision:

> **Special Features.** All Merchandise designs and mechanical features which have been supplied by Penney or the Company, where applicable, to Seller, which have been specially created or developed for Penney or the Company by Seller, or which are distinctive of Penney's or the Company's private label merchandise ("Special Features"), shall be the property of Penney or the Company and shall be used only in Merchandise manufactured for Penney or the Company. Penney or the Company may use the Special Features in Merchandise manufactured by others and obtain such legal protection as may be available for the Special Features including, without limitation, patents, design patents, copy-

---

jury action on the merits when the plaintiff has failed to carry a burden of proof in presenting the plaintiff's case. The device is replaced by the new provisions of Rule 52(c), which authorize entry of judgment against the defendant as well as the plaintiff, and earlier than the close of the case of the party against whom judgment is rendered." Advisory Committee Notes, Rule 41 (1991 Amendment).

**2.** IMAF claims that Penney knew of and approved the subcontracting of the 1985 order. *See* Plaintiff's Pre–Trial Memorandum (Pl.'sPre–T.Mem.) at 3. Penney asserted that it was not aware of the relationship between IMAF and Primavera at the time of the subcontract. *See* Defendant's Pre–Trial Memorandum (Def.'sPre–T.Mem.) at 3. When Elio testified at trial, he asserted that Penney knew that IMAF had subcontracted the order; he also testified that IMAF did not subcontract to Primavera until after Penney changed the composition of the material to be used in the sweaters. Tr. 353. Penney then produced Exhibit E, a telex from IMAF to Primavera dated February 25, 1985, in which IMAF confirmed the fabric content as the original one. The evidence therefore shows that IMAF subcontracted to Primavera only three days after contracting with Penney, despite Elio's initial claim that IMAF had intended to carry out the order internally. Because the court finds Elio's testimony not to be credible on this issue, it is similarly skeptical about Elio's assertion that Penney was informed as soon as the subcontracting took place.

rights and trademarks. Seller shall execute any and all instruments deemed by Penney or the Company to be necessary or desirable to obtain such protection in all countries of the world.

Exh. 43.

The IMAF/Penney contract also provided that Penney would pay IMAF in U.S. dollars. However, when IMAF subcontracted to Primavera, IMAF was to make payment in Italian lira. Between the time of the initial contract and the original delivery date of September 12, 1985, the value of the dollar declined so that the number of lira to which the dollar could be converted was substantially less, such that IMAF would have taken a loss on the sale of the 1985 order to Penney after paying Primavera.

The order was due on September 12. Throughout the manufacturing process, GBS representatives had worked with Primavera and had given IMAF the impression that the process was going smoothly. Although the order was not ready on time, IMAF did not send a representative to inspect the sweaters until September 30.[3] Tr. 397. When Mario went to Primavera, he found problems with the sweaters: some disparity in color, variations of measurements within the same size, and varying width of the ribbed borders on sleeves and waistbands.[4] After attempting to resolve these problems with GBS, on October 2, 1985, IMAF sent a telex to GBS requesting that the contract be cancelled. By this time the sweaters were already on their way to the United States.

Although IMAF was dissatisfied with the quality of the sweaters, Penney was willing to accept shipment. Other than requesting a confirmation of its own cancellation and release from liability, IMAF put no conditions on the cancellation. IMAF did not request that the sweaters be delivered to the company's plant, or even that they be kept in Italy; that they be withheld from delivery to Penney; or that the Adiansi label be removed. IMAF received a telex from GBS confirming cancellation on October 8, 1985. Exh. 56.

Meanwhile, Penney had an increasingly pressing need to obtain the sweaters, and purchased the order directly from Primavera. Armando Gallinaro, of GBS, issued the certificate of inspection for the sweaters on September 23. Exh. 60. GBS arranged for shipment to take place on or about October 1, and they arrived at Penney's stores for sale by mid-October.

Elio came to the United States in late October to find out from Penney what had happened to the shipment. He went to a Penney store and saw the sweaters on display; he was displeased about the quality of the sweaters, which still bore the Adiansi label. Shortly thereafter, IMAF brought suit to recover from Penney.[5]

## DISCUSSION

### I. BREACH OF CONTRACT CLAIM

The breach of contract claim raised by IMAF is somewhat ambiguous.[6] Generally, the claim appears to be rooted in the allegations that Penney, through GBS, conspired with Primavera to force IMAF out

---

3. Elio testified at trial that Mario went to see the sweaters at Primavera because IMAF suspected that GBS and Primavera were "conspiring" to cut IMAF out of the contract so that Penney could purchase directly from Primavera. IMAF did not present evidence sufficient to support such a conclusion. See infra Part I.

4. A number of the Adiansi-labelled sweaters bought at Penney in 1986 were introduced at trial. Exhs. 35, 36, 87A, 87B, 87C, 87D. The discrepancies were not clearly visible unless one sweater was compared to another, and the discrepancies were slight.

5. IMAF brought a lawsuit against Primavera in Italy, which culminated in a substantial settle-

ment. Exh. AV. Although Penney contends that the settlement covers all profits that IMAF seeks in this suit, the court does not find it necessary to examine the IMAF/Primavera settlement in depth in order to resolve the current dispute in Penney's favor.

6. In its complaint, IMAF alleged breach of the contractual covenant of good faith. In its pretrial memorandum, IMAF initially pled simple breach of contract. At trial, IMAF's counsel seemed to allege that Penney breached the contract by not paying IMAF, rather than alleging a breach of the covenant of good faith.

of the contract. Yet IMAF has failed to present evidence sufficient to support such a finding.

GBS had been communicating with Primavera and checking on the status of the manufacturing process for some time. Their correspondence was certainly proper; GBS, as Penney's agent, was responsible for approving the sweaters, and it was clear to IMAF that GBS would make periodic inspections, and that they would control quality and determine acceptance. Exh. R. Moreover, the letter of credit provides that approval be based on GBS issuing a certificate of inspection. Exh. 15.

IMAF also contends that Penney breached the contract by not paying IMAF for the sweaters. However, on October 2, Elio sent a telex to GBS that stated:

INDEPENDENTLY OF PRIMAVERA'S ILLEGITIMATE BEHAVIOUR [sic] AND OF ITS DEFAULT, AND FOR THE SOLE PURPOSE OF FACILITATING THE SETTLEMENT OF THIS QUESTION, PLEASE BE INFORMED THAT, IF PENNEY FORMALLY RELEASES US, ALSO BY TELEX, FROM ANY AND ALL RESPONSIBILITIES, CONCERNING DEFECTS AND DELAY AS WELL, WE HAVE NO DIFFICULTIES IN CONSIDERING THE CONTRACT WITH PENNEY CANCELLED.

OBVIOUSLY WE ARE RESERVING ALL ACTIONS AND CLAIMS—EXCLUSIVELY AGAINST PRIMAVERA.

Exh. 10. At no time did IMAF request: (1) that Penney not purchase directly from Primavera; (2) that the Adiansi labels be removed from the sweaters; or (3) that the shipment to Penney be cancelled. Tr. 389. In response, Penney sent a telex to IMAF stating that Penney had "requested [GBS] to issue contract chg. [change] cancelling above contract which you will be asked to sign." Exh. AO. GBS issued formal cancellation by telex. Exh. 16.

The strongest evidence that IMAF has produced is neither credible nor legally sufficient. Elio claimed at trial that he did not consider Penney's telex (Exh. AO) responsive to his own communications (Exh. 10 in particular). When asked, "Don't Exhibit AO and ... [Exhibit] 16 [say] what the Gallinaros [of GBS] responded to you—that the cancellation you requested was being accepted?" Elio replied: "Ms. Gallinaro did not say this. To better specify, Gallinaro was saying this, but she was not responsive to my fax and did not make me feel better about the risks I was running vis-a-vis Penney." Tr. 383. However, this court finds the responses (Exhibit AO and Exhibit 16) to Elio's request for cancellation to be clear. They absolve IMAF of legal liability and cancel the contract.[7] Even when Elio came to the United States in late October, he gave no indication to Penney that he wished them to remove the labels or not to sell the sweaters. Tr. 389. The court concludes that IMAF's request for cancellation served to absolve Penney from contractual liability.

## II. TRADEMARK VIOLATIONS

### A. IMAF's Assertion of Exclusive Use & Ownership

■ Before addressing IMAF's claim under the Lanham Act, the court first notes IMAF's broad legal claim of rights to the Adiansi mark that are "established by American law." Pl's.Pre–T.Mem. at 12. IMAF quotes extensively from *Energy Jet, Inc. v. Forex Corp.*, 589 F.Supp. 1110 (E.D.Mich.1984). In *Energy Jet*, there was a dispute over a trademark between a distributor and a manufacturer. The court granted rights to the manufacturer, and quoted *Hank Thorp, Inc. v. Minilite, Inc.*, 474 F.Supp. 228, 236 (D.Del.1979), to demonstrate that as a general rule, if there is

---

**7.** IMAF also claims that because its telex was received by Penney after the goods had been shipped, Penney never relied on the cancellation. However, Penney did ultimately receive the telex. One can only guess what course of action Penney would have taken if IMAF had not cancelled. It seems probable, however, that if IMAF had insisted that the goods be returned to Italy, Penney would not have sent the sweaters to its stores for retail sale. In that sense, Penney did rely on the cancellation—it assumed that it was free to proceed with the sale of the sweaters.

no agreement between a manufacturer and a distributor, the trademark rights are held by the manufacturer.

IMAF contends that this principle is unassailable. Yet this ignores the fact that in the *Energy Jet* decision, almost immediately following the passage quoted by IMAF, the court limits the holding:

> In the absence of an agreement, an exclusive distributor may acquire a trademark over the claimed ownership of a manufacturer. Such rights may be acquired if the goods are manufactured for him, if he controls their production or if "they pass through his hands in the course of trade" and "he gives them the benefit of his reputation or of his name and business style."

*Energy Jet,* 589 F.Supp. at 1116–17 (quoting *Victor Tool and Machine v. Sun Control,* 299 F.Supp. 868, 874 (E.D.Mich.1968)). This is exactly what Penney did: Penney approached IMAF with an order for manufacturing sweaters for Penney's use only; Penney had the last word as to quality; and the sweaters were being sold at Penney's stores, where Penney was backing the product with its reputation entirely—IMAF's name was in no way at risk.

Consequently, as to this preliminary matter, the court finds that IMAF did not have exclusive rights.

### B. The § 43(a) Claim

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1988), which prohibits a false designation of the origin of goods, protects even unregistered trademarks. *815 Tonawanda Street Corp. v. Fay's Drug Co.,* 842 F.2d 643 (2d Cir.1988). Judge Wood previously determined that in this case, IMAF would have to establish the validity of a trademark and infringement. *See* Memorandum Opinion of Judge Wood, May 12, 1989, at 7 (citing *Silverman v. CBS, Inc.,* 632 F.Supp. 1344, 1356 (S.D.N.Y.1986), *aff'd in part, vacated in part,* 870 F.2d 40 (2d Cir.), *cert. denied,*

492 U.S. 907, 109 S.Ct. 3219, 106 L.Ed.2d 569 (1989)).

#### 1. The Validity of IMAF's Trademark

Because "Adiansi" is a descriptive term, rather than arbitrary, suggestive, or fanciful,[8] IMAF had to prove that "Adiansi" either has a secondary meaning or is inherently distinctive in order to prove the existence of a valid trademark. *See* Memorandum Opinion of Judge Wood, May 12, 1989, at 7; *see also Two Pesos, Inc. v. Taco Cabana, Inc.,* — U.S. —, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). We agree with Penney that IMAF has failed to show a secondary meaning to the name Adiansi.

Showing secondary meaning is a "heavy burden" for the proponent. *See 20th Century Wear, Inc. v. Sanmark–Stardust Inc.,* 815 F.2d 8, 10 (2d Cir.1987). One must establish that the name and the plaintiff's business "have become synonymous in the mind of the public, submerging the primary meaning of the term in favor of its meaning as a word identifying that business." *Abraham Zion Corp. v. Lebow,* 761 F.2d 93, 104 (2d Cir.1985). Factors for the court to consider include: length and exclusivity of use, sales levels, and extent of advertising promotions. *See Thompson Medical Co. v. Pfizer, Inc.,* 753 F.2d 208, 217 (2d Cir.1985).

IMAF has failed to put forth evidence to support any of these factors. IMAF cannot show exclusive use of the Adiansi label, because of the shared use with Penney. Other than the venture with Penney, IMAF had never used the label in the United States. Penney conducted its own advertising. IMAF has also failed to produce any individual who credibly demonstrates that "Adiansi" is synonymous with "IMAF" to the American public.

IMAF did present the testimony of Angelo Savardi, who is a buyer for Benetton, an Italian-based retail seller of knitwear and other apparel. Mr. Savardi said that he saw the Adiansi label in sweaters at a J.C. Penney store in California, Tr. 31–32, and

---

**8.** Judge Friendly laid out these categories in *Abraham & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4 (2d Cir.1976). If a term is generic, it will not be protected. If it is suggestive, arbitrary, or fanciful, it is presumably distinctive and entitled to protection. *Id.* at 9–11.

he later expressed surprise to principals of IMAF that they would produce sweaters of such poor quality. Tr. 41–42.

Although Judge Wood noted that Mr. Savardi's testimony presents "strong evidence" of secondary meaning, *see* Order of Judge Wood, May 12, 1989, at 8–9, the testimony is not sufficient. As she also pointed out, "[i]n determining whether secondary meaning has been acquired, the recognition by the public of the source of the product is of paramount significance." *Id.* at 7–8 (citing *American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 663 (2d Cir.1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980)).

The fact that Mr. Savardi recognized that IMAF made the sweaters does not establish that an average consumer would do the same. Mr. Savardi is hardly an average consumer; he knows the knitwear industry well, and he is thoroughly familiar with label names. Tr. 26. Moreover, he only knew of the connection between Adiansi and IMAF based on advertisements in trade magazines and other journals that he had read in Italy. Tr. 30. The court finds that the testimony of this one witness, who is not to be classified as an ordinary consumer, fails to establish that the name Adiansi has acquired secondary meaning in the United States.

Penney also argues that "Adiansi" is not inherently distinctive because the word is a surname. *See* Def.'sPre–T.Mem. at 7. Penney's theory is that surnames are so commonplace that they are not capable of being inherently distinctive. *See Taylor Wine Co. v. Bully Hill Vineyards, Inc.*, 569 F.2d 731, 734 (2d Cir.), *modified*, 590 F.2d 701 (2d Cir.1978).

For the most part this principle is applied when a surname is, as noted, commonly recognized as a *name*. *See, e.g., In re Harris Intertype Corp.*, 518 F.2d 629 (C.C.P.A.1975). In *Harris*, the court analyzed the Lanham Act's mandate that no trademark will be given to a name that is "*primarily* merely a surname." *Id.* at 631

(emphasis added); *see also* 15 U.S.C. § 1052(e)(3). The *Harris* court affirmed the Patent and Trademark Office's refusal to register "Harris" based on, among other factors, the appearance of the name Harris 1100 times in the phone book of a major metropolitan area, which tended to establish that Harris is primarily merely a surname.[9] The court noted that "the determining factor is the primary (not secondary) significance to the public or 'the purchasing public.'" *Id.* at 631 (quoting 1 McCarthy, Trademarks and Unfair Competition 476 (1973)). The *Harris* court contrasted the name Rivera, considered in a patent application case:

> In the Rivera case, the applicant contended that "Rivera" was not primarily merely a surname, particularly since it is a Spanish word meaning a small stream or rivulet. The Assistant Commissioner simply stated: "[I]t is not believed that the average member of the purchasing public would, upon seeing "Rivera" used as a trademark on watches, be likely to think of its being a surname."

*Id.* at 632 (quoting *In re Rivera Watch Corp.*, 106 U.S.P.Q. 145, 149 (1955)).

Similarly, the name (or word) Adiansi is not likely to be immediately identified with a person by an average buyer of a sweater at J.C. Penney. Thus, the fact that Adiansi is a surname is not dispositive on the issue of inherent distinctiveness.

### 2. Infringement

 Even assuming that IMAF could successfully show inherent distinctiveness, IMAF has failed to show that infringement took place. The cornerstone to such a claim is whether there is "consumer confusion." IMAF need not show actual confusion, but merely a likelihood of confusion. *See Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). Penney argues that no likelihood of confusion existed because the goods were genuine. Penney relies on *El Greco Leather Products Co. v. Shoe*

---

**9.** By contrast, the name "Adiansi" appears in neither the business nor resident telephone list-ings for Manhattan.

*World, Inc.,* 806 F.2d 392 (2d Cir.1986), *rev'g* 599 F.Supp. 1380 (E.D.N.Y.1984), *cert. denied,* 484 U.S. 817, 108 S.Ct. 71, 98 L.Ed.2d 34 (1986).

In *El Greco,* the Second Circuit considered "whether goods manufactured by agreement with the holder of a trademark, but distributed without authorization of the holder, may be considered 'genuine' for purposes of trademark protection." *Id.* at 393. The plaintiff El Greco brought suit under section 32 of the Lanham Act, 15 U.S.C. § 1114 (1982), which requires that a trademark be registered to be protected. The goods—shoes that bore El Greco's trademark, "Candies"—were manufactured by Solemio. When El Greco cancelled their contract because they were dissatisfied with Solemio's performance, Solemio sold the shoes to defendant Shoe World. Shoe World sold the shoes at retail despite requests from El Greco not to do so. The district court dismissed El Greco's Lanham Act claim, reasoning that the goods were genuine and not within the purview of section 32 because they were not susceptible to "confusion." *See El Greco v. Shoe World, Inc.,* 599 F.Supp. 1380, 1394 (E.D.N.Y.1984).

On appeal, the circuit court reversed, looking beyond the wording of section 32 to the purpose: "One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark." *El Greco,* 806 F.2d at 395. Because El Greco had ultimate authority to control the quality of the shoes, and they were deprived of the opportunity to do so, the court held that the shoes ultimately sold by Shoe World were not "genuine." *Id.* at 395–96.

▉ IMAF claims that the facts in *El Greco* are similar to those in this case. The distinguishing feature in *El Greco,* however, is that the holder of the trademark—El Greco—was also the party whose approval was necessary before the goods could be shipped. Here, Penney (through GBS) had the authority to accept or reject the sweaters based on quality. Penney laid

out the initial specifications for the sweaters. Exh. 95. GBS was responsible for "inspecting and accepting merchandise manufactured by Italian companies with which [Penney] had contracted." Pl.'sPre–T.Mem. at 2. Elio claimed at trial that Penney absolutely did not have sole authority as to quality control. Tr. 398. His testimony, however, contradicts the terms of the contract itself. *See* Exh. D. Moreover, IMAF provided in a telex on July 5, 1985, that "the production will be periodically inspected by the company Enza International [10] who shall control the quality and who will determine acceptance." Exh. R.

IMAF also purports to satisfy the consumer confusion test by application of the "Polaroid factors," first laid out in *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492 (2d Cir.1961), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). This test considers "the strength of [plaintiff's] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers." *Id.* at 495; *see also Mushroom Makers v. R.G. Barry Corp.,* 580 F.2d 44 (2d Cir.1978). We note that in this case we do not consider the degree of similarity or proximity of the products, because IMAF and Penney are disputing use of just one product.

As to the remaining factors, IMAF cannot show any strength of the mark in this country, because IMAF has not marketed any products bearing the Adiansi label in the United States except those sold to Penney—nor did testimony reveal any intent to do so in the future. Thus IMAF has also failed to show that it may bridge the gap by entering the United States market. The only actual confusion that IMAF has shown was confusion by Mr. Savardi—an employee of Benetton who knew of IMAF's connection to Adiansi because of advertise-

**10.** "Enza International" was the name that GBS used when dealing with Italian businesses.

ments he had seen in Italy. IMAF has not convinced this court of any bad faith on Penney's part; the quality of the product was satisfactory to Penney, and IMAF's displeasure with quality is not important. IMAF lacked the authority to stop the shipment based only on their own dissatisfaction with the sweaters. Exh. R. Finally, there has been no evidence that Penney customers are any more sophisticated than the average consumer, such that they would connect the Adiansi name to IMAF. When taken together, the testimony that IMAF has produced fails to establish a violation of § 43(a).

## III. UNFAIR COMPETITION CLAIMS

■ IMAF rightly asserts that the principal behind the law of unfair competition has been expanded far beyond the early protection against palming off. The law now generally protects against other unfair trade practices; and where predatory trade practices are shown, secondary meaning need not be proven. *National Lampoon Inc. v. American Broadcasting Cos.*, 376 F.Supp. 733 (S.D.N.Y.), *aff'd*, 497 F.2d 1343 (2d Cir.1974).

### A. Palming Off

■ IMAF points out that "the most explicit example of palming off is the placing of the trademark or trade name of another on one's goods." Pl's.Pre–T.Mem. at 26. IMAF claims that "the merchandise ... had not been approved by IMAF, that the use of IMAF's label ... was unauthorized by IMAF, and that Penney knew such use was unauthorized." *Id.* Yet none of these were proven by IMAF. Indeed, each was contradicted by the evidence. The manufacture of the sweaters was clearly approved by IMAF, and the shipment was not even subject to their approval. Use of IMAF's Adiansi label was authorized when IMAF sent the label to Primavera. Exh. R. Penney did not know the use was unauthorized, which is understandable given IMAF's cancellation of the contract accompanied by a request for a release from liability. Exh. 10.

■ One requirement to establish palming off is that a plaintiff "must prove the perpetration of fraud, 'i.e., that the defendant is so foisting his product on the market that there is resulting confusion or a likelihood of confusion as to its source in the mind of the buying public.'" *Hygienic Specialties Co. v. H.G. Salzman, Inc.*, 302 F.2d 614, 621 (2d Cir.1962) (quoting *Speedry Products, Inc. v. Dri Mark Products, Inc.*, 271 F.2d 646, 648 (2d Cir.1959)). Again, the key becomes consumer confusion. As discussed *supra* Part II.B.1., there was no such confusion proven in this case, and IMAF has put forth no evidence that would tend to establish fraud.

### B. Misappropriation

■ IMAF claims that Penney misappropriated the Adiansi label without their permission. Although unfair competition in the form of misappropriation "has been broadly described as encompassing 'any form of commercial immorality,'" *Roy Export Co. Establishment v. Columbia Broadcasting System, Inc.*, 672 F.2d 1095, 1105 (2d Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982), IMAF failed to present evidence at trial to support even the slightest "immoral" behavior by Penney.

IMAF relies heavily upon *Flexitized, Inc. v. National Flexitized Corp.*, 335 F.2d 774 (2d Cir.1964), *cert. denied*, 380 U.S. 913, 85 S.Ct. 899, 13 L.Ed.2d 799 (1965). Yet even in that case, where the plaintiff prevailed, the court pointed out that the name in question had "acquired a familiarity among prospective purchasers ... which made such prospective buyers more likely to purchase items called 'Flexitized' because of that name in connection with them." *Id.* at 782. In this case, there is no evidence that purchasers of the Adiansi-labelled sweaters were more likely to purchase these sweaters because of IMAF's reputation; if they relied on any name, they relied on the name of Penney. IMAF failed to produce a single witness other than Mr. Savardi to support this claim. *See supra* Part II.B.1. This court finds that testimony insufficient to establish misappropriation.

## IV. ATTORNEYS' FEES

Although several of IMAF's claims survived Penney's pre-trial motions, the court finds no merit to those claims. Penney has requested an award of attorneys' fees, alleging bad faith on the part of IMAF. The court has requested that Penney submit proof of reasonable value of necessary and compensable services under the Lanham Act, and further asks that both parties submit briefs on the issue of fees.

## CONCLUSION

For the foregoing reasons, each of IMAF's claims is dismissed on the merits, with costs to be paid by IMAF. This Opinion shall constitute the findings of fact and conclusions of law as required by Rule 52.

SO ORDERED.